# Exhibit C

# The Civil Rights Division's
# Pattern and Practice Police Reform Work:
# 1994-Present



Civil Rights Division
U.S. Department of Justice

*January 2017*



TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  BACKGROUND – THE HISTORY AND PURPOSE OF SECTION 14141 ......................................3

III. INITIATING A PATTERN-OR-PRACTICE INVESTIGATION .......................................................5
    Identifying the Need for a Pattern-or-Practice Investigation ........................................................5
    Prioritizing Among Viable Pattern-or-Practice Investigations Across the United States...................................6
    Opening an Investigation...................................................................................... 8

IV. CONDUCTING AN INVESTIGATION .......................................................................................9
    The Role of Policing Experts in Pattern-or-Practice Investigations..................................................10
    The Role of Data Analysis in Pattern-or-Practice Investigations.....................................................11
    The Role of the Law Enforcement Agency in Pattern-or-Practice Investigations.........................................11
    The Role of the Community in Pattern-or-Practice Investigations ....................................................13
    The Role of United States Attorney's Offices in Pattern-or-Practice Investigations.....................................14
    The Length of Pattern-or-Practice Investigations .................................................................14
    Concluding a Pattern-or-Practice Investigation ..................................................................15

V. NEGOTIATING REFORM AGREEMENTS...................................................................................17

VI.  THE CURRENT REFORM MODEL AND ITS RATIONALE ..........................................................20
A) The Structure of the Division's Police Reform Agreements ......................................................20
    Court-Enforceable Consent Decrees...............................................................................20
    An Independent Monitoring Team .................................................................................21
    Outcome Measures to Assess Progress ............................................................................23

B) The Substance of the Division's Police Reform Agreements .....................................................25
    Advancing a Community and Problem-Oriented Policing Strategy .....................................................26
    Promoting Bias-Free Policing ...................................................................................26
    Use of Force Principles ........................................................................................27
    Community Engagement ...........................................................................................29
    Departmental Policy Changes and Re-training.....................................................................30
    Reforming Accountability Systems................................................................................30
    Officer Wellness and Support ...................................................................................33
    Recognizing the Link Between Policing and Other Criminal Justice and Social Systems..................................33

VII. CONCLUDING THE CIVIL RIGHTS DIVISION'S POLICE REFORM AGREEMENTS ...............35

VIII. CONCLUSION: ASSESSING THE IMPACT OF PATTERN-OR-PRACTICE ENFORCEMENT ON
      POLICE REFORM.....................................................................................................38

APPENDIX A: SUMMARIES OF THE DIVISION'S PATTERN-OR-PRACTICE CASES........................ 41
    Other Open Pattern-or-Practice Cases...........................................................................47

APPENDIX B: OTHER DEPARTMENT OF JUSTICE POLICE REFORM TOOLS.............................49
    Criminal Civil Rights Prosecutions.............................................................................49
    Office of Community Oriented Policing Services (COPS Office) Collaborative Reform Initiative for
    Technical Assistance ..........................................................................................50
    OJP Bureau of Justice Assistance and Diagnostic Center.........................................................50

# I. INTRODUCTION

There are more than 18,000 law enforcement agencies across the country. Law enforcement is a demanding, rigorous, and – at times – dangerous profession. The vast majority of men and women who police our communities do so with professionalism, respect, bravery, and integrity. But as we have seen around the country, when police departments engage in unconstitutional policing, their actions can severely undermine both community trust and public safety.

Today, our country is engaged in a critically important conversation about community-police relations. This report describes one of the United States Department of Justice's central tools for accomplishing police reform, restoring police-community trust, and strengthening officer and public safety – the Civil Rights Division's enforcement of the civil prohibition on a "pattern or practice" of policing that violates the Constitution or other federal laws (the Department's other tools are described later in this document). Pattern-or-practice cases begin with investigations of allegations of systemic police misconduct and, when the allegations are substantiated, end with comprehensive agreements designed to support constitutional and effective policing and restore trust between police and communities. The Division has opened 11 new pattern-or-practice investigations and negotiated 19 new reform agreements since 2012 alone, often with the substantial assistance of the local United States Attorney's Offices.

The purpose of this report to make the Division's police reform work more accessible and transparent. The usual course of a pattern-or-practice case, with examples and explanations for why the Division approaches this work the way it does, is set forth in this report. The following is a brief summary of its major themes:

- The Division's pattern-or-practice cases focus on systemic police misconduct rather than isolated instances of wrongdoing. They also focus on the responsibilities of law enforcement agencies and local governments rather than on individual officers.

- The Division's pattern-or-practice cases begin with the launch of a formal investigation into a law enforcement agency to determine whether the agency is engaged in a pattern or practice of violating federal law. An investigation most often consists of a comprehensive analysis of the policies and practices of policing in a particular community, although an investigation may also focus on a specific area of policing practice.

- If the Division finds a pattern or practice of police misconduct, it issues public findings in the form of a letter or report made available to the local jurisdiction and the public. The Division conducts a thorough and independent investigation into allegations of police misconduct and substantiates any conclusions it draws with evidence set forth in its public findings.

- After making findings, the Division negotiates reform agreements resolving those findings, usually in the form of a "consent decree" overseen by a federal court and an independent monitoring team. The lead independent monitor is appointed by the court, and usually agreed upon by both the Division and the investigated party, but reports directly to the

1

court. If an agreement cannot be negotiated, the Division will bring a lawsuit to compel needed reforms.

- When the court finds that the law enforcement agency has accomplished and sustained the requirements of the reform agreement, the case is terminated. In recent years, the Division's reform agreements have included data-driven outcome measures designed to provide clear and objective standards for measuring success and determining whether the law enforcement agency has met the objectives of the agreement.

- At all stages of a pattern-or-practice case, from investigation through resolution, the Division emphasizes engagement with a wide variety of stakeholders, including community members and people who have been victims of police misconduct or live in the neighborhoods most impacted by police misconduct, police leadership, rank and file officers, police labor organizations, and local political leaders. Each of these groups brings a different and important perspective and plays a critical role in accomplishing and sustaining police reform.

- In keeping with the focus on systemic problems, the Division's reform agreements emphasize institutional reforms such as improving systems for supervising officers and holding them accountable for misconduct; ensuring officers have the policy guidance, training, equipment and other resources necessary for constitutional and effective policing; creating and using data about police activity to identify and correct patterns of police misconduct; and institutionalizing law enforcement agencies' engagement with and accountability to the community.

The sections that follow provide background on why Congress gave the Division authority to address systemic police misconduct, how the Division opens pattern-or-practice investigations, what an investigation involves, and how the Division negotiates reform agreements. The report then outlines the common threads among the Division's current generation of police reform agreements, explaining how the Division's model promotes sustainable reform and constitutional, effective policing, as well as how those agreements come to a close. Finally, the report discusses the evidence to date of the impact of the Division's pattern-or-practice work on police reform, as well as future directions for research and reflection on that impact.

## II. BACKGROUND – THE HISTORY AND PURPOSE OF SECTION 14141

In 1991, video of the beating of Rodney King by Los Angeles police officers sparked widespread public outrage. The officers' acquittal on state criminal charges in 1992 triggered riots in Los Angeles and protests across the nation. (Later, two of the officers involved were successfully prosecuted on federal charges by the Criminal Section of the Department of Justice, Civil Rights Division.) An independent commission linked the beating of Mr. King to institutional failure within the Los Angeles Police Department, and Congress held hearings on how the federal government could do more to address police misconduct.[1]

Following that series of events, in 1994 Congress authorized the Attorney General to investigate and litigate cases involving "a pattern or practice of conduct by law enforcement officers" that violates Constitutional or federal rights.[2] Under this authority, the Civil Rights Division of the Department of Justice may obtain a court order requiring state or local law enforcement agencies to address institutional failures that cause systemic police misconduct.[3] These cases are commonly referred to inside the Division as "pattern-or-practice cases" or "14141 cases" after the section of the United States Code codifying this authority, 42 U.S.C. § 14141.

Pattern-or-practice cases are investigated, litigated and resolved by the Special Litigation Section of the Civil Rights Division of the Department of Justice, sometimes assisted by the local United States Attorney's Office. The Special Litigation Section consists of career professional attorneys with many decades of collective experience working on police reform cases. They are specialists in the field of criminal justice reform and have worked with police departments large and small to address the wide range of issues and challenges in modern policing and bring about lawful and effective police practices. The Special Litigation Section also has experienced investigators and community outreach specialists to assist in gathering the information needed to ensure the integrity and thoroughness of the Division's investigations and reform efforts.

Section 14141 is a vehicle for the Department of Justice to enforce rights defined and protected by the Constitution and other federal laws, such as the rights to be free from excessive force; unreasonable stops and searches; arrests without warrants or sufficient cause, or in retaliation for exercising free speech rights; and discrimination based on factors such as race, ethnicity, national origin, religion, disability, and sex—including sexual orientation, gender identity and LGBT status.[4]

The first pattern-or-practice policing case brought under Section 14141 was in **Pittsburgh**, Pennsylvania. In January 1997, following a nearly year-long investigation, the Division issued a letter to the City of Pittsburgh finding a pattern or practice of excessive force, false arrests, and improper searches and seizures, grounded in a lack of adequate discipline for misconduct and a failure to supervise officers. The parties negotiated a resolution and jointly entered a court-ordered reform agreement overseen by an independent monitor that was in effect from April 1997 until September 2002, with ongoing monitoring through 2005. The Vera Institute of Justice conducted an independent, extensively researched assessment of that effort after it concluded, describing it as "a success story for local police management and for federal intervention."[5]

Since then, the Division has opened 69 formal investigations, and entered into 40 reform agreements to bring much-needed change to police departments. At the time of this publication, the Division had 18 open reform agreements, 5 open investigations, and one case in active litigation.[6]

Much has changed since the Division's first initiatives under Section 14141. The Division's process for conducting pattern-or-practice cases and the model the Division uses to design effective reforms have evolved as the Division has responded to feedback from stakeholders—including state and local law enforcement, developments in the social science of police reform, and lessons from its own experience in this field. In that sense, the Pittsburgh consent decree and many of the early reform agreements that followed it reflect a different era in the Division's history. A focus on fixing broken systems and building police-community trust remain the consistent themes of the Division's pattern-or-practice police reform. But the methods for fixing those systems and restoring that trust, as well as the means for assessing the success of those methods, have evolved significantly. The following sections describe the Division's current process for enforcement and its model for reform.

## III. INITIATING A PATTERN-OR-PRACTICE INVESTIGATION

In general, the first stage in a pattern-or-practice case is an internal process by which the Civil Rights Division decides whether to open an investigation into a particular law enforcement agency. The decision to open an investigation is made by the Assistant Attorney General of the Civil Rights Division upon the recommendation and advice of experienced career professional attorneys and investigators from the Division's Special Litigation Section.

In making the decision whether to open an investigation, the threshold questions the Division asks are:

- Would the allegations, if proven, establish a violation of the Constitution or federal laws?

- Would the allegations, if proven, constitute a pattern or practice, as opposed to sporadic or isolated violations of the Constitution or federal laws?

### Identifying the Need for a Pattern-or-Practice Investigation

To determine how to best direct its resources, staff in the Civil Rights Division regularly examine information available to the Division, including publicly available information and confidential information provided to the Division by witnesses and complainants, to conduct preliminary inquiries into whether law enforcement agencies may be engaging in a pattern or practice of police misconduct. Although the Division is not a complaint-driven agency, and there is no requirement that it take action in response to every allegation or request to investigate, it regularly receives and reviews complaints from affected community members and families, advocacy groups, prosecutors and defense attorneys, judges, legislators, and police officers with knowledge of misconduct. In some instances, the Division will receive a request to investigate from a law enforcement agency or local government officials in the relevant jurisdiction.

The Division also conducts its own research to identify potential subjects for investigation by, for example, examining information provided by other agencies or components of the Department of Justice, including local United States Attorney's Offices; reviewing investigative reports by academics, review panels, and journalists; monitoring existing lawsuits involving law enforcement agencies; tracking complaints received over time by the Division; and consulting with persons or organizations likely to have relevant information about policing issues around the country. Access to information during a preliminary inquiry is critical to the Division's efforts, and local communities play a key role in bringing information to the Division's attention.

The Division's preliminary inquiries are confidential, as they reflect deliberative agency decision-making and constitute confidential investigative process. The Division has opened hundreds of preliminary inquiries since the enactment of Section 14141 in 1994.

## Prioritizing Among Viable Pattern-or-Practice Investigations Across the United States

The Division's police reform strategy is not, and cannot be, premised on an effort to investigate every police department in need of reform among the more than 18,000 law enforcement agencies in the United States. The Division identifies far more jurisdictions that meet the basic criteria for opening an investigation than it is able to investigate. Law enforcement officers today are asked to do more than ever in communities, often amidst fraying infrastructure and social support networks, as well as rising community anger and frustration that makes the job of police officers more complex and challenging than ever before. In that context, it is no surprise that the need for police reform is so great. The Division also receives a large quantity of complaints and information intended to prompt a pattern-or-practice investigation, requiring the exercise of discretion and judgment to ensure that its law enforcement authority is used efficiently and effectively.

Given the necessity to prioritize, the national context of the Division's police reform efforts is a central consideration in the decision to open an investigation. The Division considers whether the allegations represent an issue common to many law enforcement agencies as well as whether the allegations represent an emerging or developing issue, such that reforms could have an impact beyond the primary objective of eliminating constitutional violations in the specific law enforcement agency.

Many of the Division's investigations focus on core issues in police reform common to many law enforcement agencies—such as patterns of unlawful use of force; unlawful stops, searches and arrests; and racial discrimination. Others of the Division's more recent investigations have focused on issues law enforcement agencies are currently grappling with, where federal action might help set a standard for reform, such as unlawful arrests and retaliatory force against persons exercising their First Amendment right to observe and record police activity; gender bias in police enforcement; and the use of force against persons with disabilities or who are in mental health crisis. These are just some examples of recent Division priorities, and those priorities change over time as the Division is responsive to contemporary issues in policing and the law.

Although many people may be familiar with the Division's police reform agreements addressing use of force or discriminatory policing on the basis of race or national origin, the Division's agreements have addressed a wide range of issues in policing. For example:

- In **Baltimore**, the Division found a pattern or practice of systemic violations of the Americans with Disabilities Act by the police department, focusing on the failure to make reasonable accommodations when interacting with people with mental health disabilities.

- In **Los Angeles County**, the Division's reform agreement addresses a pattern of singling out people who receive federal housing subsidies for unconstitutional stops, searches, arrests and uses of force linked to community bias against people poor enough to qualify for such assistance.

- In **New Orleans**, the Division found that officers systematically undercounted rapes and other sex crimes.  Officers also wrongly arrested transgender women for prostitution and then charged them under the state's "crimes against nature" law. Multiple convictions under this law forced them to register as sex offenders, hurting their chances of landing a job or finding a home. The Division's reform agreement addresses these practices.

- In **Ferguson**, Missouri, the Division's reform agreement addresses municipal court practices that imposed court fines and fees on people unable to pay them, which contributed to discriminatory and unconstitutional policing through the use of police officers as municipal debt collection agents.

- In **Portland**, Oregon, the Division's reform agreement addresses interactions between police and people who are in mental health crisis, requiring department-wide policy changes and training designed to reduce use of force and facilitate the diversion of such people into community services and treatment, where appropriate, as well as supporting local government efforts to increase the availability of such services.

- In **Puerto Rico** and **New Orleans**, the Division's reform agreements contain provisions aimed at eliminating policing practices that discriminate on the basis of sexual orientation, gender identity, or gender expression.

- In **Evangeline Parish and Ville Platte**, Louisiana, the Division's recent letter of findings addresses the use of so-called "investigative holds"—illegally jailing people who police think may be witnesses to or otherwise associated with a crime, but who police do not have any probable cause to arrest, often for the purpose of coercing the person into confessing or providing information about the crime. The Division also addressed a similar practice in **Ferguson**, Missouri, where officers issued "wanteds" for arrests without probable cause.

In deciding whether to initiate a pattern-or-practice investigation, the Division also considers whether other forms of federal intervention are better suited to address a particular law enforcement agency's needs. The United States has a range of tools to support constitutional and effective policing other than pattern-or-practice investigations—including criminal civil rights prosecutions of individual law enforcement officers and various programs and initiatives run by the Department of Justice's Office of Community Oriented Policing Services (COPS) and Office of Justice Programs (OJP).  (More information about each of these tools can be found in Appendix B of this report.) The Division consults regularly with staff from COPS, OJP and other components of the

Department of Justice to consider whether a pattern-or-practice investigation and enforcement action is the best approach or whether other forms of intervention would be more appropriate to address the issues in a particular jurisdiction.

Even when the Division uncovers evidence of concerning policing practices in the course of a preliminary inquiry, it is common for the Division to defer to another federal component's reform efforts, or to refer law enforcement agencies to other components when the issues seem better suited to that component's approach. The Division also considers the context of local reform efforts, including actions by private litigants or advocacy groups, and whether federal action is needed to expand or support such efforts, or to otherwise ensure that effective reform occurs.

A high-profile incident—such as a shooting death, a use of excessive force, or a false arrest—standing alone never warrants opening a pattern-or-practice investigation. Individual incidents may suggest a systemic problem and often, therefore, comprise part of the information the Division relies upon to justify opening an investigation. But the focus of a pattern-or-practice case is on systemic reform of widespread police practices and institutional change within police departments, not addressing isolated or sporadic instances of police misconduct.

## Opening an Investigation

At the end of the preliminary inquiry stage, if the career attorneys and managers of the Division's Special Litigation Section determine that there is sufficient cause to investigate an alleged pattern or practice of violations of the Constitution or federal laws and that opening an investigation advances the federal government's interest in constitutional policing, the Section recommends opening an investigation to the Assistant Attorney General for Civil Rights.

If the Assistant Attorney General agrees that an investigation is warranted and authorizes an investigation, the Division notifies the jurisdiction's chief executive officer and chief legal officer of the Division's intent to open an investigation, generally in advance of any public announcement. That notice will generally identify the specific areas of inquiry to define the scope of the investigation. Following that notification, the Division makes the existence of the open investigation public.

In the more than twenty years since the Division first undertook a pattern-or-practice investigation, the Division has opened a total of 69 formal investigations. It has investigated (or is currently investigating) some of the nation's largest police departments (**Puerto Rico**, with more than 18,000 sworn officers; and **Chicago**, with over 12,000), some of the smallest departments (**Ferguson**, Missouri, with fewer than 60; **East Haven**, Connecticut, with approximately 50), and many in between. It has investigated big-city departments like **Seattle** and **Baltimore**, small-city departments like **Warren**, Ohio, and suburban departments like **Suffolk County,** New York, and **Prince George's County**, Maryland. The Division has investigated departments in California, Arizona, Texas, Illinois, Michigan, Louisiana, Florida, Maryland, New York, Connecticut, and many places in between.



This map does not include places where the Division has opened investigations but not concluded reform agreements.

## IV. Conducting an Investigation

The Division's pattern-or-practice investigations examine not only whether there is a pattern or practice of police misconduct, but also *why* such a pattern or practice exists, in order to identify the right reform steps to eliminate it. As a result, when the Division finds cause to open an investigation, it comprehensively evaluates the law enforcement agency's relevant written policies and actual practices, including its systems for training, equipping, and supervising officers; how it collects and uses data to identify and address problems; its systems for holding officers accountable for misconduct; and the degree of accountability to community voices and democratic government.

Attorneys, investigators, paralegals, and community outreach specialists from the Civil Rights Division and, often, local United States Attorney's Offices, alongside policing experts retained for purposes of the investigation, typically spend significant time meeting with people face-to-face, listening to the concerns of the police and the communities they serve, and directly observing how policing works in that location.[7]

Although the precise contours of an investigation will vary depending on factors such as the investigation's scope, the structure of the law enforcement agency, its data collection practices, and other factors, almost all pattern-or-practice investigations involve the following steps:

- Immediately following the opening of an investigation, meeting with the law enforcement leadership, local political leadership, police labor unions and affinity groups, and local community groups to explain the basis for the investigation, preview what the investigation will involve, and explain the next steps in the Division's process;

- Reviewing written policies, procedures, and training materials relevant to the scope of the investigation, through requests for documents shared with the law enforcement agency;

- Reviewing systems for monitoring and supervising individual officers, and for holding individual officers accountable for misconduct, including the handling of misconduct complaints; systems for reviewing arrests, searches, or uses of force; and officer disciplinary systems;

- Observing officer training sessions; ride-alongs with officers on patrol in varying precincts or districts, to view policing on the ground and obtain the perspective of officers on the job; and inspections of police stations, including lock-up facilities;

- Analyzing incident-related data (i.e., arrest and force reports, disciplinary records, misconduct complaints and investigations, and data documenting stops, searches, arrests and uses of force), often using sampling methods depending on the size of the data set, as well as an analysis of the adequacy of the law enforcement agency's system for collecting and analyzing data to identify and correct problems;

- Interviews with police command staff and officers at all levels of rank and authority in the department, both current and former; representatives of police labor organizations and other office affinity groups; community representatives and persons who have been victims of police misconduct; and local government leadership, including members of the local executive branch, legislators, judges, and prosecutors.

## The Role of Policing Experts in Pattern-or-Practice Investigations

The Division in almost every case engages expert consultants from the outset of an investigation to assist and support the Division's experienced attorneys and investigators. Most often, the Division retains current and former police chiefs and deputy chiefs to serve in these roles. It looks for experts with past experience in departments similar to the one under investigation, or with backgrounds tailored to the issues raised in a particular investigation. For example, in **Ferguson**, Missouri, the Division retained two chiefs of small-to-mid-sized law enforcement agencies to ensure that its investigation would be informed by experts knowledgeable in the specific challenges faced by such agencies.

Policing experts assist the Division in assessing evidence gathered in the course of an investigation, such as arrest reports, use-of-force investigative files, and training curricula. They offer valuable

10

context for the information the Division receives, and can help the Division to more quickly understand how a particular law enforcement agency's systems work. Experts also help the Division link patterns of police misconduct with systemic deficiencies in the way the law enforcement agency operates. While the Division retains ultimate responsibility to draw its own conclusions and issue its own findings regarding the existence of a pattern or practice of police misconduct, the perspectives of policing experts add value and strength to those findings.

## The Role of Data Analysis in Pattern-or-Practice Investigations

The Division also reviews large volumes of records—in larger departments, often in the range of hundreds of thousands of pages—and collects and analyzes data. Use of force investigations in larger law enforcement agencies, for example, frequently involve a random sample of non-deadly force reports as well as a thorough review of investigative files for all deadly forces cases. In investigations focusing on stops, searches, and arrests, the Division may review a random sample of incident reports for the sufficiency of reasonable suspicion and probable cause. In reviewing these files, the Division looks for systemic constitutional violations, like patterns of excessive force or unjustified stops, as well as indicators of institutional deficiencies in policy, training, and accountability that may lead to such unlawful patterns.

In addition, many of the Division's investigations include complex statistical analyses developed in conjunction with statistical experts and criminologists. For example, in assessing an agency's search practices for racial disparities, the Division will often analyze "hit rates," or the rate at which searches of certain racial or ethnic groups yield a finding of contraband compared with searches of other groups. In **Ferguson**, Missouri, for example, the Division revealed that African-Americans were 26% less likely to be found with contraband after a search, even though that group was twice as likely as others to be searched during a traffic stop. The Division conducted similar analyses in **Baltimore** and other cases.

In analyzing "hit rates" and other data points, the Division often uses regression analysis to identify patterns of discriminatory policing and control for an array of factors that could provide alternative explanations for patterns of disproportionate use of force or stops of racial or ethnic minorities. Such factors may include demographics or benchmarks for criminal activity, such as dissimilar rates of involvement in crimes for different races or ethnicities based on available data in reported crime. In analyzing search "hit rates," for example, regression analysis controls for any differences in the stated reason for the search, and in assessing whether certain racial or ethnic groups receive more adverse treatment following a traffic stop, regression analysis controls for the reason the stop was initiated. In **Maricopa County**, Arizona, for example, the Division based its findings of discriminatory traffic enforcement in part on regression analyses of the law enforcement agency's rate of traffic stops that controlled for the rate at which people of different ethnic backgrounds violate traffic laws.

## The Role of the Law Enforcement Agency in Pattern-or-Practice Investigations

As part of its investigations, the Division emphasizes outreach to all levels of a law enforcement agency, from the chief executive through management and including rank-and-file officers. In the Division's experience, engaged and committed police leadership makes investigations more effective

and efficient.   Police leaders set the tone for the law enforcement agency's approach to an investigation, particularly in the early stages. The Division works hard to ensure that its process is transparent and does not unduly distract from the business of law enforcement.

> In **Baltimore**, police union representatives explained to the Division the stress placed on officers by a staffing scheme that resulted in officers working double 10-hour shifts with only a few hours break between, and the impact of that stress on officers' capacity to police constitutionally and effectively.  Indeed, many of the well-documented complaints from the Baltimore Fraternal Order of Police informed the Division's Findings Letter in that case.

Rank-and-file officers also provide an essential perspective on both problems within an agency and how to address them. Engagement with individual officers helps the Division recognize when police misconduct is the result of systemic, institutional failures that let down not only the community members who suffer violations of their rights but also the individual officers called upon to police without adequate training, support, or resources.  In **Baltimore**, for example, meetings with individual officers helped the Division identify the ways in which lack of access to basic technology, such as in-car laptops and functioning computers at district headquarters, impaired their ability to police constitutionally and effectively.

The Division engages officers both directly—at roll-calls, during ride-alongs, and in face-to-face meetings—and through the police unions and affinity groups that serve as representatives of individual officers' interests. The Division meets with representatives of police labor organizations and affinity groups (such as groups representing black, Latino, female, or LGBTQ officers) throughout an investigation to explain the purpose and general structure of the planned investigation, answer questions, and ensure that Division staff have a clear understanding of the often complex, varied, and nuanced concerns of a law enforcement agency's sworn officers and other employees. United States Attorney's Offices often play an important role in the outreach and relationship-building with local law enforcement.

Police unions and affinity groups provide a critical perspective in a pattern-or-practice investigation. As with individual officers, they often direct the Division to aspects of problems otherwise obscured to outside review. They provide important insight into the question of why observable patterns of police misconduct occur. They pinpoint the linkages between policing practices and systemic, institutional failures such as actual or perceived unfairness within a law enforcement agency, or a lack of training, equipment, or other resources.  In many cases, police unions have pointed out the link between officer perceptions of a lack of fairness and procedural justice within police accountability and disciplinary systems and the lack of procedural justice in police-community encounters. These examples illustrate concretely how incorporating the perspective of police officers has strengthened the Division's reform work.

Officers and unions have the potential to play a critical role in building trust between law enforcement and the communities they serve.  Unions have an important role in ensuring that law enforcement agencies are transparent, officers' positive community interactions are valued and rewarded, and accountability systems are fair and consistent.

## The Role of the Community in Pattern-or-Practice Investigations

Community input and engagement is a core part of every pattern-or-practice investigation. Hearing from the community, in all its diverse forms, is necessary for the Division to obtain complete and accurate information about patterns and practices of police misconduct. The Division often hears perspectives from community representatives about particular aspects of a policing problem that may not have otherwise been obvious from documents or other sources. For example, in

> In **Ferguson**, Missouri, the Division reviewed an arrest report in which officers explained they had to use a canine to retrieve a 14 year-old boy hiding in a closet during what they described as a burglary in progress because the boy would not follow commands and show his hands. The Division's investigators located and spoke to the boy, who explained that he had been skipping school and hanging out with friends in an abandoned building, that he never hid from police, and that he never heard any police warnings or had an opportunity to surrender before officers sent the dog to retrieve him. The dog bit the boy's arm, causing puncture wounds.

**Ferguson**, Missouri, community input as well as frustration expressed by individual officers led the Division to understand the role that municipal court practices—including the imposition of court fines and fees and the use of police officers as municipal debt collection agents—played in the erosion of trust between communities and police, spurring the Division to investigate court practices as part of its pattern-or-practice investigation of the Ferguson Police Department.

The Division engages the community proactively from the very start of its pattern-or-practice investigations. As with local law enforcement, United States Attorney's Offices often play an important role in such engagement. That engagement involves outreach to civic leaders, faith leaders, neighborhood groups, advocacy organizations, local business owners, and individuals. The Division often engages language interpreters to ensure outreach to communities and people with limited English proficiency and specifically seeks out input from groups that may experience police misconduct in unique ways, such as young people, people with disabilities, LGBTQ people, people of color, and immigrant communities. Different parts of the community often bring varied perspectives on and opinions about police reform, and the Division strives to ensure that all voices are heard.

The Division almost always conducts a series of community or town hall meetings in different locations designed to create a forum for members of the community to speak to their experiences and insights. These face-to-face meetings also help build relationships between community members and the lawyers, investigators, and community outreach specialists conducting the investigation. The Division generally creates voice and email mailboxes to receive information from community members. It may, depending on community input, reach out through neighborhood listservs, community blogs, social media, and radio stations. The Division also canvasses places communities gather—places of worship, street corners, apartment complexes, parks, shopping malls, and local businesses. In some communities, frustration runs so high that its takes little more than an active presence to elicit robust community input. In other communities, distrust of government and disappointment in past reform efforts require proactive and patient effort.

The Division also gathers evidence from people who have experienced specific instances of police misconduct themselves or within their families. That evidence provides necessary context for the

Division's review of incident reports and other internal documentation from law enforcement agencies about particular police-community interactions.

Combined with the Division's other investigatory tools, community input provides a broader perspective and often supports factual findings that form the basis for the Division's investigatory conclusions.    Without access to that critical information, the Division could not make comprehensive findings, and its remedies would be less effective.

If the Division finds a pattern or practice, community engagement at the investigative stage also lays the foundation for community participation and engagement in the solutions the Division negotiates to any findings of police misconduct. And, in a very real sense, community engagement at the investigative stage is the first step in reform, particularly in places where trust and communication between police and communities has broken down severely. The process of bringing people together and identifying the common threads of their experience in the context of a federal commitment to reform can begin to rebuild faith in government institutions.

## The Role of United States Attorney's Offices in Pattern-or-Practice Investigations

The Civil Rights Division often works with the local United States Attorney's Office in opening and conducting pattern-or-practice investigations. The degree of participation of those offices varies from case to case, but in many cases United States Attorneys take on significant roles.  United States Attorney's Offices often provide important knowledge of the local context and history of policing, assisting the Division's staff as they get to know the unique people, places, and dynamics of each community.  In certain cases, especially in areas where United States Attorney's Offices have dedicated civil rights resources, those offices continue to play a critical role throughout the process of negotiating and implementing a reform agreement.

## The Length of Pattern-or-Practice Investigations

The time an investigation takes varies greatly. It depends on factors like the size of the law enforcement agency, scope of the investigation, the complexity of the allegations, the quality of the jurisdiction's recordkeeping, and the degree of cooperation the Division receives from the jurisdiction and other stakeholders. As a result, there is no typical length of time for a pattern-or-practice investigation.

Many investigations take over a year. The Division spends substantial time in jurisdictions under investigation, meeting face-to-face with diverse stakeholders from the law enforcement agency, local government and the community. It gathers and reviews vast quantities of documents and data. Even when law enforcement agencies keep robust electronic records, reviewing anywhere from thousands to tens of thousands of incident reports to identify patterns or practices—review that is a core element of the Division's policing investigations—takes a significant amount of time. And, unfortunately, the agencies the Division investigates—ones that are already exhibiting signs of systemic failures by meeting the threshold for a federal investigation—often do not keep well-maintained, comprehensive electronic records. In many cases, staff within the Division must create electronic databases from paper files in order to conduct the type of pattern analysis required to

make findings of systemic police misconduct, or must conduct complex calculations with the assistance of statistical experts to compensate for inadequacies in the agency's data.

For communities and officers who experience daily the stresses and strains of dysfunction in a law enforcement agency, the length of the Division's pattern-or-practice investigations can be an understandable source of stress. Ultimately, however, the thoroughness of the Division's investigations underpins the credibility and effectiveness of its reform efforts. The Division may inform the law enforcement agency of specific problems that emerge clearly in the course of an investigation, as well as advice or suggestions for change, to provide the agency with the opportunity to address problems as quickly as possible. In some instances, the Division has drawn on other federal resources—such as the assistance of the Office of Community Oriented Policing Services (COPS) or the Office of Justice Programs (OJP)—to provide technical assistance or other support to make those changes. In this way, an investigation can trigger reform even before the Division has made formal findings.

## Concluding a Pattern-or-Practice Investigation

The Division aims to continuously engage with the law enforcement agency and community stakeholders during an investigation to ensure that the Division's process and developing conclusions are transparent.

If the Division determines that there is insufficient evidence to support a finding of a pattern or practice of conduct in violation of the Constitution or federal law, the Division will notify the jurisdiction of that finding and close the investigation. Of 69 total investigations since Section 14141's enactment, the Division has closed 26 investigations without making a formal finding of a pattern or practice. Since 2008, the Division has concluded six investigations of law enforcement agencies without finding a pattern or practice of police misconduct.



If, on the other hand, the Division determines that there is reasonable cause to believe that there is a pattern or practice of conduct in violation of the Constitution or federal law, the Division will send a letter or report (sometimes referred to as a "Findings Letter" or "Findings Report") notifying the jurisdiction of the Division's determination and setting forth the specific conclusions underlying the Division's determination. The announcement of findings is typically accompanied by a day of meetings with police leadership and command staff, police unions, and community stakeholders to

present and explain the findings and discuss next steps. The Division's findings are public documents and are posted on the Division's website.

A Findings Letter or Report represents the culmination of the evidence the Division gathered in the course of its investigation. It lays out the basis for the Division's findings, linking those findings to specific problems within a law enforcement agency or between that agency and other parts of local government. The document also sets forth the steps the Division took to complete its investigation, so that the community and the law enforcement agency understand the sources and evidence on which the Division based its conclusions. It is both a diagnosis of a law enforcement agency's problems and the foundation for a plan to treat the root causes of those problems. Since the Division began releasing formal, public findings, they have become an important step in the process of reform, documenting and validating the concerns that led to the Division's investigation and framing expectations for the reforms to come.

# V. NEGOTIATING REFORM AGREEMENTS

A Findings Letter shifts the focus of a pattern-or-practice case from identifying problems to creating solutions. The process of designing comprehensive, durable and successful reforms to resolve the sort of widespread and deeply rooted patterns of police misconduct that the Division's pattern-or-practice cases address takes time. As in the investigatory stage, the Division systematically seeks input from all stakeholders to inform its negotiations with the law enforcement agency and local government.

In the course of an investigation, the Division continuously engages in open communication with both the law enforcement agency and the community. As a result of that communication, at the conclusion of an investigation the Division sometimes issues a joint statement with a jurisdiction memorializing the commitment to necessary reforms. These statements— often called "Statements of Intent" or "Agreements in Principle"—set a general framework for negotiations over a reform agreement and signal the parties' intent to avoid litigation and come to an agreement to address the Division's findings.

> Unions and individual officer input often focuses on resource issues as well. In **Cleveland**, officers felt strongly that their department did not have enough supervisors but lacked data needed to establish appropriate staffing levels, so the Division's reform agreement contains a requirement that the Cleveland Division of Police conduct a staffing study to determine the scope of the problem and address it. Officers also reported that most patrol cars did not have working computers, so that when officers conducted vehicle stops they often lacked basic information about the vehicle and its driver, including whether the vehicle was stolen or involved in a crime, or whether the registered owner was wanted on outstanding warrants. This placed officers at unnecessary risk and created the possibility that traffic stops could escalate unnecessarily. The Division's reform agreement requires the City of Cleveland to provide for necessary equipment including patrol cars with reliable, functioning computers.

Before negotiations over a reform agreement begin in earnest, however, the Division seeks community input regarding remedies to the issues identified in the Findings Letter. The Division holds community meetings and draws on relationships built during the investigation stage to involve the community in building solutions. Often the Division will present specific briefings on its findings to community representatives and hold meetings focused on particular aspects of those findings designed to drill down on specific remedies. The Division always encourages community representatives to present specific proposals for reform, in writing or at a community meeting, and works to incorporate those proposals into its reform agreements.

Community input has informed the provisions of the Division's reform agreements. In **Cleveland**, community input played a key role in shaping solutions to that city's broken system of community oversight, helping the Division and the Cleveland Division of Police to understand the value of reforming rather than replacing that system because of the community's significant investment in it. In recent years, the Division has incorporated community feedback into the mechanism of community engagement built into many other of its reform agreements—for example, by mandating that community meetings be held in places accessible to public transportation.

17

The Division also seeks the input of rank-and-file officers and police unions and affinity groups. Individual officers at all ranks have interests in fair process, and safe working conditions that must be taken into account as Division shifts its focus from problems to solutions.  As with community stakeholders, the Division generally briefs police unions and affinity groups on its findings and seeks out specific proposals for reform.

Input from officers and their representatives have informed aspects of the Division's specific consent decrees. For example, several of the Division's reform agreements—including in **Ferguson,** **Albuquerque,** **Cleveland,** **Puerto Rico**, **Seattle**, and **New Orleans**—contain provisions that directly address issues of officer wellness that were raised by officers and their families in the Division's discussions during the negotiation process.  In **New Orleans**, the Division learned from officers and unions the degree to which the lack of counseling and support services for officers called upon to police in extraordinary circumstances of Hurricane Katrina's aftermath took an enormous toll on officer morale and mental health.

Beyond the specific impacts engaging community leaders, line officers and police unions have on the content of the Division's reform agreements, engagement with all stakeholders is itself the cornerstone of the Division's reform process. All stakeholders must feel invested in the remedies presented in the Division's reform agreements. Communities must be invested for the long-term sustainability of reform. Individual officers who, day-to-day, will carry out the reforms must be invested for the long-term durability of reform.  And police and local leadership must be invested to provide the leadership and support a long-term commitment reform requires.

Thus, although the Division negotiates resolutions to its pattern-or-practice cases with representatives of the agency or government under investigation, it does so equipped with the information gathered from community representatives, rank-and-file officers, police union leadership, and other stakeholders, and with a commitment to ensuring that the input of those stakeholders remains a part of the process. Direct negotiations over a reform agreement are bilateral and confidential, to best facilitate reaching an agreement.

As in the investigatory stage, the Division approaches discussions about remedies in a cooperative manner.  The Division's goal in every case is to avoid contentious litigation and begin the process of reform as quickly as possible. Although the process involves lawyers and takes place against a backdrop of potential legal remedies, the Division's discussions do not resemble the sort of zero-sum, adversarial negotiations commonly associated with most civil litigation. The Division does not stake out aggressive positions merely for the purposes of creating negotiating leverage, and rarely finds that local jurisdictions withhold agreement on common-sense measures merely for that purpose, either.  To the contrary, the Division's experience, in general, has been that law enforcement agencies receiving a Findings Letter understand the value of reform and share the Division's interest in addressing the issues identified in the course of the pattern-or-practice investigation.

As a result, of the many dozens of cases in which the Division has found a pattern or practice of police misconduct, all but six have resulted in a reform agreement without the need for civil litigation.  In **Colorado City**, Arizona, the Division obtained a verdict at trial. In **Alamance County**, North Carolina, the Division did not prevail at trial, but appealed and entered into a settlement reform agreement while the appeal was pending. In **Maricopa County**, Arizona, litigation was required to enforce a court order requiring reforms, resulting in an order of contempt.

In **Meridian**, Mississippi, the Division entered into a consent decree shortly after filing suit, after the City initially declined to negotiate.  Likewise, in **Columbus**, Ohio, the Division filed litigation but later reached an agreement resolving its claims. And in **Ferguson**, Missouri, the City initially rejected a proposed consent decree resolving the Division's findings but later accepted it shortly after the United States filed suit in federal court.  In a seventh case, in **New Orleans**, the Division was forced to litigate to compel the City of New Orleans' compliance with a consent decree to which it had previously agreed.  Thus, although it is rare and not the preferred outcome, the Division is fully prepared to litigate pattern-or-practice cases when jurisdictions refuse to agree upon necessary reforms.



## VI.  THE CURRENT REFORM MODEL AND ITS RATIONALE

Pattern-or-practice cases are designed to achieve organizational change within police departments where institutional failures have caused systemic police misconduct.  As a result, the remedies associated with these cases are geared toward changing polices, practices, and culture across a law enforcement agency.  Moreover, the Division is keenly aware, as many prominent policing scholars have noted, that its consent decrees can inform reform measures in police departments across the country.[8]

As a result, the Division regularly reflects on and applies the research and expertise of policing experts to inform its approach to police reform. The Division pays close attention to consensus opinions in the law enforcement profession regarding best practices for preventing police misconduct.  The Division is actively engaged with national police experts and, as previously noted, weighs and, where appropriate, incorporates the feedback of communities, government leaders, rank-and-file officers, and police leadership in every jurisdiction it enters.

It is important to emphasize that the model of reform reflected in the Division's consent decrees has changed over time as the Division has learned from its own experiences enforcing Section 14141, responded to feedback from law enforcement and community stakeholders, and incorporated developments in the social science of police reform. In 2010, the Department of Justice convened a roundtable of law enforcement officials, policing experts, advocates, and other stakeholders to discuss the Division's pattern-or-practice work. Although the participants acknowledged the positive impact of the Division's consent decrees, the meeting also produced a number of important suggestions that are reflected in the Division's current generation of reform agreements.[9]

Although the Division's reform agreements are informed by a consistent approach to police reform, the provisions of any given agreement will vary depending on the Division's findings, the structure and operations of the particular agency, and other local dynamics. There is no "cookie cutter" Department of Justice police reform agreement. Every reform agreement contains unique provisions specifically tailored to that jurisdiction. Nonetheless, the structure and substance of the Division's current generation of reform agreements generally reflect similar basic themes.

## A) The Structure of the Division's Police Reform Agreements

The Division's current reform agreements commonly contain the following elements:

### Court-Enforceable Consent Decrees

Where the Division has found evidence of a pattern or practice of police misconduct, resolution generally will take the form of an order enforced by a federal court.  These orders are usually called "consent decrees," reflecting that the terms of the order were negotiated and agreed to by the United States and the law enforcement agency that was investigated.  Although the Division has pursued several different approaches to the structure of its settlement agreements in the two decades since Section 14141 enforcement began, its experience demonstrates that court-enforceable consent decrees are most effective in ensuring accountability, transparency in implementation, and flexibility for accomplishing complex institutional reforms. Federal court oversight is often critical to address

broad and deeply entrenched problems and to ensure the credibility of the reform agreement's mandates.

The Division may, in relatively rare cases, resolve a pattern-or-practice finding by a "memorandum of agreement" enforceable in federal court as a contract between the United States and the local jurisdiction, rather than as a consent decree actively overseen by a federal court. Such an outcome generally only occurs when the issues to be addressed are relatively narrow and there is significant evidence that the jurisdiction has the capacity to accomplish and sustain reform in a timely manner without ongoing court oversight. The Division has also on occasion entered into memoranda of agreement on specific issues when its findings do not rise to the level of a pattern or practice in violation of federal law, but there are problems that the federal government and local jurisdiction can work together to resolve.

## An Independent Monitoring Team

The appointment of an independent monitor—or, more accurately, an independent monitoring team—is a nearly universal feature of the Division's reform agreements. Of 18 currently open reform agreements, all but four are overseen by independent monitoring teams.

Sometimes the named monitor is a person, who works with a team; other times it may be an organization, firm, or corporate entity. Monitoring teams generally include diverse perspectives, including team members with real-world policing experience reflecting both a management and rank-and-file perspective.  For example, in **New Orleans** and **Cleveland**, the monitoring teams comprise a diverse group of former police executives and officers, academics, attorneys, and community organizers. The Cleveland monitoring team includes a former legal counsel to police unions and a consultant with technical expertise in law enforcement information technology, appropriate to that agreement's focus on that department's data and technological capacity. The independent monitoring team is generally the agent of the court overseeing the reform agreement and is independent from the Department of Justice and the local jurisdiction, although, as discussed further below, most monitoring teams are jointly agreed upon by the Division and the local jurisdiction before being appointed by the court.

The core of the monitoring team's role is to:

- Assess and report on the law enforcement agency's progress in implementing the reform agreement;
- Assist the agency in developing a plan to implement reforms and address any barriers to implementation, including by providing technical assistance;
- Evaluate whether the reforms mandated by the agreement are working and, if not, to recommend changes;
- Constructively engage communities and stakeholders in the reform process; and
- Assist the local jurisdiction and the United States in resolving any differences that might arise over the particulars of implementing the reform agreement.

Each of these aspects of the monitoring team's role is critical to the overall success of the Division's reform agreements. Monitors act as an intermediary between the Division, the local jurisdiction, and the court and assist in resolving disputes. In this role, the independence of the monitoring team is

key. The monitoring team's credibility allows it to play the role of neutral broker and mediator, to ensure that disagreements over the meaning of a provision or the significance of a new initiative do not become distractions from the overall goal of achieving effective, constitutional policing. The independence of the monitoring team also bolsters the credibility, in the eyes of the public, of the final court determination that the reform agreement has been implemented.

At the most basic level, the monitoring team's job is to monitor and report on progress under the agreement. To that end, the Division's reform agreements ensure that the monitoring team has necessary access to the agency's documents and data, as well as the ability to conduct on-site inspections and site visits without prior notice. Monitoring teams are empowered to conduct audits and reviews on all the topics covered by a reform agreement. And they are required to issue public reports detailing the status of implementing the reform agreement, usually on a quarterly or bi-annual basis. In the Division's current generation of reform agreements, the monitor's assessment of implementation is an objective task that turns on the achievement of specific, defined benchmarks and outcome measures.

The monitoring team also assists the law enforcement agency in developing a framework for implementing the agreement, ensuring that deadlines are met and reforms are accomplished. The monitoring team advises and supports the law enforcement agency to define terms, refine outcome measures, develop specific plans for implementation, and address any barriers to compliance. Monitors also support law enforcement agencies by, where appropriate, lending independent credibility to departments' and advocates' efforts to obtain the community and political support necessary to implement reforms.

As the Division's reform agreements have come to emphasize substantive outcomes over procedural changes—a development discussed in greater detail below—the monitor has also come to play a critical role in assessing whether the reforms mandated by the agreement are accomplishing their underlying goals. The Division's reform agreements now universally include a "look back" provision that mandates a comprehensive re-evaluation of the agreement to ensure that it is well-designed to achieve meaningful police reform, usually between one and three years after the agreement begins. Even outside of this institutionalized process, reform agreements generally require the monitor to constantly engage in an assessment of the effectiveness of particular provisions of the Division's reform agreements and to propose new approaches to improve outcomes.

---

**EPIC Program in New Orleans**

In **New Orleans**, the monitoring team worked with NOPD to develop an innovative peer intervention program called "Ethical Policing is Courageous" ("EPIC") to give officers skills, training, and support to successfully intervene when another officer is about to commit misconduct. The program promises to improve officer and community safety, help rebuild police-community relations, and serve as a model nationwide. The Division's reform agreement addressed the need for training and support to reduce patterns of police misconduct, but this peer intervention program was the result of collaboration between the monitoring team and NOPD in implementing the provisions of the reform agreement.

---

22

Monitoring teams also carry forth the community and stakeholder engagement necessary to build public confidence in the implementation of consent decrees.  In the current generation of reform agreements, monitor reports are required to be public documents, which the Division generally posts to its website, and many agreements contain further provisions requiring the release of critical data—such as data about stops, searches and arrests or rates of use of force—that allow communities to participate in assessing the law enforcement agency's progress toward reform. Many reform agreements—including those in **Ferguson, Albuquerque, Cleveland, Puerto Rico, New Orleans**, and **Seattle**—require that the monitor hold regular public meetings to directly engage communities in the monitoring process. The Division's most recent consent decree, in **Newark**, additionally requires the monitor to hold regular meetings with representatives of rank-and-file officers, further ensuring that the monitor remains responsive to a broad range of critical stakeholders in reform.

Selection of a monitor generally begins as a joint process between the Division and the local jurisdiction. Usually following a public solicitation process, the parties screen and interview candidates and endeavor to make a joint recommendation for approval by the court.  The Division has found that respecting the input of the local jurisdiction in selecting a monitor bolsters the monitor's credibility and increases stakeholder confidence in the monitor.[10] Beginning with the **Pittsburgh** case in 1997, the Division has largely succeeded in coming to agreement with local jurisdictions and the court on the identity of the monitor. When the Division is unable to come to agreement, however, the parties typically will ask the court overseeing the consent decree to resolve the dispute and select the monitor, thus ensuring that the monitor is beholden only to the court.

The local jurisdiction generally bears the costs of supporting the monitoring team, but the Division takes steps to ensure that the cost is reasonable and sustainable.  In some cases—for example, in **Cleveland**, Ohio and **Meridian**, Mississippi—the monitoring team itself absorbs some of the administrative costs and contributes significant amounts of time free of charge. The Division has made cost estimates a critical part of its screening process for selecting monitor candidates. The current generation of reform agreements emphasizes objective measures and a gradual narrowing of the scope of the agreement to ensure that the monitoring team remains focused and works efficiently. Where cost issues have arisen as a legitimate barrier to necessary reform, the Division has worked with the monitoring team, the local jurisdiction, and the court to address those concerns.

The monitor has a difficult role—one of the most challenging roles in the complex undertaking of systemic police reform.  The job of the monitor involves overseeing reform in agencies where the Division has found systemic failure and widespread police misconduct, generally the result of deeply entrenched cultural, political, and economic dysfunction. The monitor must earn the respect and trust of the law enforcement agency, the community, the Department of Justice, and the court. And the monitor must maintain that respect and trust as it tackles the root causes of systemic police misconduct.

## Outcome Measures to Assess Progress

With the first generation of police reform agreements, the Division assessed progress by a series of process measures: Did the law enforcement agency complete certain training requirements? Has it hired additional staff? Has it adopted new written policies? Although these measures accurately assessed the agency's compliance with the terms of the reform agreement, they could not answer a

more fundamental question: was the agency reducing or eliminating the pattern or practice of police misconduct that necessitated that reform agreement in the first place?

In more recent years, the Division has built outcome measures into its police reform agreements in order to measure not only whether the processes required by the Division's reform agreements are actually implemented but also whether those processes lead to improvements in the quality of policing and reductions in patterns of misconduct. This innovation resulted from extensive consultation with policing experts, law enforcement leaders, and academics, as well as the application of the Division's internal expertise, to identify the best and most viable ways to measure progress on police reform.

Outcome measures vary from case to case, as they are tailored to the particular outcomes the reform agreement is trying to reach in that place. But certain outcome measures can be found in almost every reform agreement. For example, the Division routinely incorporates a community survey into its reform agreements to establish a baseline for and, over the course of reform, to measure improvements in community trust and how changes in police culture are reflected in the responses of affected communities. In **Seattle**, the community survey has allowed the Division to track steady improvements in community perceptions of the Seattle Police Department over the course of the reform agreement, including among African-American and Latino populations, as well as improvement in the ratings community members give based on police encounters with themselves, friends, family members, and neighbors, against a backdrop of overall reduction in crime.

---

**Stop, Search and Arrest Outcome Measures**

In agreements addressing stops, searches, and arrests, the Division typically tracks data such as:

- The rate of stops, searches and arrests, including by location and by the subject's race, ethnicity, gender, and age;
- "Hit rates" – i.e., how often stops and searches lead to citations, arrests, or the discovery of contraband;
- How often stops, searches, and arrests are accompanied by sufficient documentation of suspicion;
- The number of civilian complaints regarding stops, searches, and arrests and how often those complaints are sustained or substantiated;
- How often prosecutors decline to prosecute charges following arrests.

For such data, the Division's reform agreements require that the monitor develop a methodology for tracking such data and analyzing it in a manner that controls for factors that could explain or justify certain rates of stops, searches or arrests.

---

The Division's reform agreements also may track qualitative data to allow the independent monitor to assess how often stops, searches, and arrests are supported by the required level of reasonable suspicion or probable cause.

24

> **Use of Force Outcome Measures**
>
> In agreements addressing use of force, the Division typically tracks data such as:
>
> - The rate of use of force—overall, by type of encounter (i.e., street stop, traffic stop, arrest, call for service); by type of force; by location; and by subject's race, ethnicity, gender, and age;
> - The number of civilian complaints regarding use of force and how often those complaints are sustained or substantiated;
> - How often force reviews reveal that a use of force violated agency policy or the law;
> - The number of officers who have had more than one instance of force found to violate agency policy or the law;
> - How often officers or members of the public are injured during police encounters.
>
> As with stop, search, and arrest data, the Division's reform agreements require that the monitor develop a methodology ensuring that analysis of such data controls for factors that could explain or justify certain rates of force.

The Division's reform agreements also may track qualitative data sufficient for the independent monitor to assess the reasonableness of uses of force or the quality of a department's investigation and review of instances of force.

These are only some examples of the outcome measures incorporated into the Division's reform agreements. In all cases, data related to the outcome measures are gathered and reviewed by the independent monitoring team, which uses the data to assess the law enforcement agency's implementation of the reform agreement. The monitoring team also makes its analysis of outcome measure data available to the public to ensure transparency and accountability in the monitoring process.

Outcome measures not only vary across reform agreements, they often change over the course of a particular agreement. Many of the Division's reform agreements call for the independent monitor to review and recommend changes to the outcome measures set forth in the agreement in a three or six-month window following enactment of the agreement. The purpose of this provision is ensure that the outcome measures respond to the dynamic nature of policing and continue to properly assess whether the underlying goal of police reform—to restore community trust and promote effective, constitutional policing—is being accomplished.

## B) The Substance of the Division's Police Reform Agreements

In addition to the structural components described above, the Division's reform agreements often reflect a common set of substantive reforms – namely, advancing a community and problem-oriented policing strategy, promoting bias-free policing, addressing unlawful use of force, community engagement, departmental policy changes and re-training, reforming accountability systems, promoting officer wellness and support, and addressing the link between policing and other criminal justice and social systems.

25

Whether reforms falling into these categories appear in any given reform agreement depends on whether they address the specific findings made in the course of a pattern-or-practice investigation, but these are common threads among the Division's agreements.

## Advancing a Community and Problem-Oriented Policing Strategy

The Division's reform agreements generally aim to shift law enforcement agencies toward a model of community and problem-oriented policing. The heart of this approach is a focus on strong relationships and collaboration between police and the communities they serve; the application of modern management practices and organizational structures to create a culture of community partnership; transparency and accountability to communities and democratic government; and decentralized, proactive, community-based solutions to community public safety priorities.[11]

In the current generation of the Division's reform agreements, adoption of a community and problem-oriented policing strategy, as well as the staffing structure necessary to support such a strategy, is generally a central part of the agreement. For example, in **Newark**, New Jersey and **Albuquerque**, New Mexico, the Division's reform agreement require the integration of community and problem-oriented policing concepts into management structures, resource deployments, policies, and training systems.

The Division's promotion of community and problem-oriented policing strategies helps make policing safer and more effective. Officers can only police safely and effectively if they maintain the trust and cooperation of the communities they serve.

## Promoting Bias-Free Policing

Many of the Division's reform agreements address patterns or practices of discriminatory policing. Combating discrimination on the basis of race and ethnicity has been a long-standing priority. And issues relating to language access and gender bias—particularly in the handling of sexual assault and domestic violence cases and the treatment of LGBTQ people—have also emerged as key areas of reform. The Division's agreements have addressed these issues in many ways, including the following:

- *Policies Prohibiting Bias-Based Policing.* Several of the Division's reform agreements have focused on the need for policies designed to prohibit and prevent bias-based policing. In many instances, law enforcement agencies where the Division has found indications of discriminatory policing have lacked the most basic policies and training designed to prevent the unlawful reliance on race or ethnicity in using force, making stops, searches or arrests, or other police activity. For example, in **Puerto Rico** and **Steubenville**, Ohio, the Division's reform agreement requires the law enforcement agency to develop a comprehensive set of policies, procedures, and training initiatives to ensure that policing is not tainted by bias based on race, ethnicity, religion, gender, disability, sexual orientation or any other impermissible factor. In **Suffolk County**, New York, the Division's reform agreement contains provisions designed to ensure that the Suffolk County Police Department adequately responds to crimes against Latinos, including hate crimes, to address findings that SCPD neglected reports of attacks and other incidents against Latinos.

- *Ensuring Equitable Policing.* In other departments, discrimination manifests as too little policing rather than too much – systemic failure to respond to calls for service in certain neighborhoods, or lack of attention to certain crimes or crime victims. In those places, the Division's reform agreements have focused on tracking data about police activity, re-training and adjusting priorities to ensure that policing decisions are not based on racial, ethnic, or gender-based bias.

- *Disparate Impact Analysis.* Many of the Division's reform agreements require law enforcement agencies to analyze data about police activity to determine whether such activity is having a disparate impact on communities of color or other groups. Where such analysis shows a disparate impact, the agency is required to investigate whether the disparity can be explained by legitimate factors or reflects bias, and to take steps to ensure that such patterns do not erode relationships between police and communities. For example, in **New Orleans**, the Division's reform agreement requires the New Orleans Police Department to assess all its programs and activities to ensure that none discriminate on the basis of race, national origin, religion, gender, disability, sexual orientation, gender identity, or any other impermissible basis.

- *Implicit Bias Training.* Training on implicit bias has been a core feature of the Division's reform agreements since 2012. In places such as **Newark,** New Jersey; **Ferguson**, Missouri **Suffolk County**, New York, and **Los Angeles County**, California, the Division's reform agreements provide for comprehensive analyses designed to track and address patterns of policing that have a disparate impact on communities of color or people with limited English proficiency. In other places, the Division's reform agreements promote targeted policy changes and training programs to improve responses to allegations of sexual assault and domestic violence, or to address the treatment of particularly vulnerable populations such as immigrant communities, people with limited English proficiency, or LGBTQ people.

## Use of Force Principles

Addressing systemic excessive force is one of the core functions of the Division's pattern-or-practice cases. Many of the Division's agreements involve comprehensive reform to a law enforcement agency's policies and training about the use of force, while other provisions may focus on more specific problems such as the use of force against people with disabilities or in mental health crisis, the misuse of particular weapons, or the failure to properly document or review uses of force.

Although the remedies for a pattern or practice of unconstitutional use of force varies from place to place depending on the scope and nature of the problem, several core principles emerge from the Division's reform agreements addressing force issues—principles that are reflected in best practices issued by national policing experts.[12] Among those core principles are the following:

- *Proportionality and De-Escalation:* The Division's reform agreements universally include policies and training that instruct officers to use only force that is proportional to the threat faced, and to rely upon de-escalation tactics. Some of the Division's agreements—such as the agreement in **Ferguson**, Missouri—emphasize officers' responsibility to intervene to de-escalate encounters or prevent unreasonable uses of force by other officers.

27

- *Prohibiting the Use of Retaliatory Force:* The Division's reform agreements often explicitly prohibit the use of retaliatory force, such as force used after a threat has diminished, or to punish individuals for fleeing, resisting arrest, or disrespecting an officer.

- *Limits on Choke or Neck Holds, and Head Strikes:* The Division's reform agreements frequently contain policies prohibiting the use of neck holds, also known as chokeholds, or head strikes with hard objects, except in situations where lethal force is authorized.

- *Limits on Use of Force on Handcuffed or Restrained People:* The Division's reform agreements generally promote policies that prohibit the use of force against persons in handcuffs, except in limited circumstances such as to prevent imminent bodily harm to an officer or another person.

- *Clear Policies on Specific Weapons, Including Firearms and Less-Lethal Weapons*: Especially in places where the Division has found a pattern or practice of unlawful lethal force or unreasonable use of a particular type of force, the Division's reform agreements emphasize the importance of clear policies governing specific weapons, often incorporating best practices from police experts on the use of a particular weapon. The Division's agreements frequently address policies and training governing firearms, electronic control weapons ("ECWs," also known as Tasers), oleoresin capsicum spray ("OC spray," also known as pepper spray), canines, and other instruments of force.

- *Systems for Handling Encounters with People with Disabilities or in Mental Health Crisis*: Increasingly, the Division's reform agreements have addressed the need for special steps to address force resulting from officers' encounters with people with disabilities in crisis. Unofficial data representing one the best current sources on police shootings suggests that, in 2015, at least one in four people shot and killed by police showed signs of mental illness.[13] The Division's reform agreements often promote the creation of Crisis Intervention teams or units, specialized training for officers on crisis-intervention tactics, and community health collaborations designed to increase the diversion of people with disabilities out of the criminal justice system and into the health system.

- *Providing Necessary Medical Assistance.* The Division's reform agreements often emphasize the need to train officers to administer necessary medical assistance following uses of force that cause injuries.

- *Documenting and Reviewing Uses of Force*: From the earliest reform agreements, the Division has always promoted comprehensive documentation, data collection, investigation, and review of all uses of force to ensure that the agency's practices are not unreasonable or discriminatory. Every reform agreement addressing use of force issues incorporates provisions requiring clear, specific, and complete reporting and requiring supervisory review of all significant uses of force. Often, this includes specialized review of incidents involving death or serious injury. In addition, the Division's reform agreements emphasize comprehensive data collection and systemic review of an agency's use of force data to identify patterns and trends in the unnecessary use of force.

## Community Engagement

As has been discussed throughout this document, community engagement is an essential component of the Division's police reform strategy. At the remedies stage, the focus shifts from the *Division's* engagement with the community to the *law enforcement agency's* engagement with the community, as well as the broader question of the agency's accountability to democratic processes and the public. Community engagement, oversight, and democratic accountability go hand-in-hand in the Division's current generation of reform agreements. All of the Division's current generation of consent decrees require some form of community outreach and engagement, including mechanisms to institutionalize strong relationships between the law enforcement agency and the community it serves, ensure the community has a role in setting priorities for a police department, and make police practices and data transparent to the public.

- *Community Outreach Plans.* Nearly all of the Division's current generation of reform agreements require law enforcement agencies to develop a plan for institutionalizing community engagement, whether by appointing community liaison officers, fostering police-community partnerships, holding regular community meetings, or tracking and rewarding positive interactions between officers and community groups. For example, in **East Haven**, Connecticut, the Division's reform agreement requires the appointment of a Community Liaison Officer fluent in English and Spanish whose responsibilities include monthly community meetings, review of civilian complaints to identity trends in community concerns, and regular briefings on community engagement with police leadership.

- *Community Committees or Councils.* The Division's current model emphasizes the creation of or investment in standing committees or councils of community members with authority to advise the law enforcement agency about community concerns and proposed reforms.  For example, in **Seattle**, Washington, the Division's reform agreement established a Community Police Commission with diverse membership and broad authority to review and provide input on police reform and to receive and incorporate community feedback.

- *Civilian Complaint Review Boards.* Civilian review boards, which are a focus of the discussion of accountability mechanisms in the section that follows, provide another mechanism for community members to engage with police practices.

- *Community-Based Mediation Programs.* Some agreements—notably those in **Ferguson**, Missouri and **New Orleans**—provide for neighborhood-based mediation programs to promote the diversion of community disputes out of the criminal justice system and into community-based, community-run institutions.

- *Data Collection and Transparency.* Robust collection of data about police activity, as well as ensuring transparency and accessibility of that data—also discussed as part of accountability measures below—are important to ensure that communities have the tools to provide informed input.

- *The Role of the Independent Monitoring Team.* As previously discussed, laying the foundation for strong police-community relationships is one of the most critical roles of the independent monitoring team. The Division's agreements generally institutionalize face-to-face meetings

between the monitoring team and the public, to ensure that communities are engaged in the process of reform.

The Division also maintains ongoing community engagement during the lifetime of a reform agreement, drawing upon the relationships established from the earliest days of an investigation. But the goal of the Division's reform agreements is to ensure that once the Division and the independent monitor leave the jurisdiction, vibrant police-community relationships will remain as the foundation of sustainable constitutional policing.

## Departmental Policy Changes and Re-training

Reform of written policies and improved or increased training have always been a central aspect of the Division's police reform agreements. Policies incorporating each requirement of the reform agreement are necessary to ensure that reforms become part of the fabric of the law enforcement agency, rather than viewed as changes specific to the particular police chief in place when the reform agreement was implemented. Some consent decrees address law enforcement agencies' lack of systems for updating policies to reflect developments in the law and best practices. Others address a lack of any system for developing and distributing policies and policy updates. Some address specific policies, such as how police handle bystanders who record police activity, mass public protests and demonstrations, or encounters with persons with disabilities in crisis; or how police use particular forms of force, such as canines, ECWs/Tasers, OC/pepper spray, or vehicle pursuits.

Policy changes required by the Division's reform agreements almost always extend beyond reform of the substantive rules of policing—e.g., when may an officer stop, search, arrest, or use force on a person—to include the procedural rules of policing—e.g., what documentation, supervisory review, or other institutional response is required when an officer engages in a stop, search, arrest, or use of force.

As many policing experts have noted for decades, policy changes alone are rarely adequate to accomplish durable police reform. The Division's reform agreements nearly always link policies to action through training requirements necessary to overcome the institutional and cultural barriers to effective and constitutional policing that triggered the Division's investigation in the first instance. In many cases, the Division's reform agreements address not only specific training programs designed to accomplish a particular change in practice but also establish a foundational training program where none previously existed, whether an academy program for new recruits or in-service training programs necessary to ensure that officers are kept abreast of development in the law and best practices.

## Reforming Accountability Systems

Inadequate systems for holding law enforcement agencies accountable to communities and individual officers accountable for misconduct are at the heart of nearly every finding of a pattern or practice the Division has ever issued. As a result, improving accountability systems occupies a prominent place in the Division's reform agreements.

- *Data tracking and Transparency.* The Division's reform agreements almost always address a law enforcement agency's internal systems for recording, tracking, and reviewing police

actions—whether uses of force; stops, searches and arrests; the issuing of warrants; resolution of misconduct complaints; or any other significant police activity. As noted above, such data is generally required to be tracked and analyzed by the independent monitor for purposes of assessing the agency's compliance with a federal reform agreement. But the Division's reform agreements also seek to institutionalize that kind of review within the agency so that it can continue after a reform agreement terminates.

- The Division's reform efforts also emphasize making data transparency part of the culture of the law enforcement agency. Reform agreements of the current era universally require law enforcement agencies make data available to the public in a responsible and accessible format. Public monitoring reports also provide a window into a law enforcement agency's policies and practices, as well as an important source of information about progress toward reform.  Participants in the Department's 2010 convening emphasized the importance of ensuring that the consent decree implementation process was transparent and that data should be made available to the public throughout that process.[14] That feedback is clearly reflected in recent reform agreement provisions requiring that not only monitoring reports but also critical data from outcome measures should be publicly available.

- *Early Intervention Systems.* Early intervention systems (EIS)—also known as "early warning systems"—are a particular aspect of internal review that have been a consistent feature of the Division's policing reform agreements since the beginning of the Division's Section 14141 enforcement. EIS refers to a system of electronically tracking individual officer performance for the purpose of identifying officers who appear to engage in an abnormal pattern of problematic behavior and intervening at an early stage to correct that behavior and prevent patterns of misconduct from emerging. Problematic behavior may include high rates of use of force, large numbers of citizen complaints, involvement in civil litigation alleging misconduct, and inordinate use of sick time leave, among many other criteria. EIS aims not to punish officers for misconduct but to allow for proactive management and administrative interventions before serious problems arise, such as training, counseling by supervisors, or referral to professional counselors. The Division's reform agreements emphasize not only the creation of such systems, but also the requirement that police leadership and supervisors analyze the data gathered by these systems, address emerging patterns of police misconduct, and enhance individual officer accountability. Experts in policing have described EIS as one of the most important management tools for monitoring officer performance and as "central to the goal of changing the organizational culture of a police department to effect long-term, sustainable police reform."[15]

- *Video Technology.* The Division's reform agreements have also promoted the use of video technology to support internal supervision and increase police accountability. As far back as 1999, the Division incorporated the use of in-car cameras into its reform agreements to provide for greater transparency and accountability around traffic stops and other police encounters that can be observed from a patrol car. Policing experts and empirical studies strongly support the positive effects of in-car cameras on accountability and officer safety.[16] More recently, the Division has encouraged expanded access to body-worn cameras as part of broader approach to improving accountability and trust between police and the citizens they serve, as well as public safety. Although research into the effect of body-worn cameras is ongoing, evidence to date strongly suggests that body-worn cameras improve the quality

of police interactions and reduce both the number of citizen complaints and instances of police use of force.[17]

- *Supervisory Systems.* The Division's reform agreements also frequently address a law enforcement agency's supervisory systems, including ensuring that an agency has sufficient numbers of supervisory officers, that those officers have adequate supervisory training, and that they have workloads that permit them sufficient time to be effective supervisors.

- *Misconduct Complaints.* The Division's reform agreements also generally address internal systems for responding to civilian complaints of police misconduct. Fair, transparent, and efficient investigation and resolution of civilian complaints is an important element of institutional accountability.  Moreover, civilian complaints are a valuable source of information for police managers and supervisors responsible for identifying and intervening to prevent officer performance problems.  Reforms have focused on facilitating the filing of complaints by civilians; ensuring that civilian complaints are recorded, tracked, and used as feedback by police leaders; guaranteeing that all complaints are fairly and thoroughly investigated; and ensuring the integrity of the review process.

- Many of the Division's reform agreements also create, expand, or reform independent civilian complaint review boards or other independent civilian review systems, such as an Inspector General. A frequent focus of the Division's reforms to civilian oversight systems is to increase the community's role in developing such systems and creating more opportunities for community feedback on their operation. The Division's reform agreements also may address reforms designed to ensure that a law enforcement agency's response to a validated complaint—including officer disciplinary systems—are transparent and consistent with basic principles of procedural justice and properly balance the need for effective responses to misconduct with the need for fairness to individual officers.

- *Recruitment, Hiring, and Promotion Systems.* Finally, the Division's recent reform agreements recognize that inadequacies in law enforcement agencies' recruitment, hiring, and promotion systems are significant drivers of police misconduct.  Misguiding staffing priorities may prevent a law enforcement agency from carrying out a community-centered, problem-oriented policing strategy and increase the pressure to resort to zero-tolerance tactics, as well as straining officer health and wellness by imposing unreasonable workloads on individual officers. A failure to use recruitment, hiring, and promotion systems to attract, retain and reward highly qualified officers capable of carrying out the complicated mission of constitutional policing—including, for example, by requiring law enforcement agencies to investigate the employment history of new hires—impedes efforts to shift police culture to one of accountability and public service. Poorly designed hiring and promotion policies also damage officer morale and may lead officers to react to a perceived lack of procedural justice in their own workplace by failing to implement procedural justice in their policing.

  Where the Division's findings indicate a link between these issues and patterns or practices of police misconduct, the Division's reform agreements address them by, for example, requiring new staffing plans, requiring greater investment in recruitment and retention systems, and ensuring that an officer's disciplinary history and history of civilian complaints is accounted for in promotion and lateral hiring decisions.

## Officer Wellness and Support

As the Division has often recognized, police officers today are burdened with responsibility for social problems that extend far beyond a traditional focus on responding to and solving crimes. We ask police to put their lives on the line in situations that include resolving family disputes, dealing with mental illness, and addressing alcohol and drug addiction. Police officers must handle these complex problems against a backdrop of systemic inequalities and policy failures—including poverty, a lack of jobs and education, and inadequate housing—all of which can increase in crime place enormous stress on individual officers.

In the law enforcement agencies the Division is called upon to investigate, this stress is often magnified by inadequate resources and malfunctioning systems. At the most basic level, fatigue and stress impact officers' health, judgment, and performance, and thereby increase the risk of police misconduct. The Division's experience in police reform underscores how individual instances of police misconduct occur amidst institutional failures to provide officers with the resources and training necessary to carry out the enormous responsibilities placed on police officers.

Many of the Division's reform agreements—include those in **Ferguson**, Missouri; **Albuquerque**, New Mexico; **Cleveland**, Ohio; **Puerto Rico**; and **New Orleans**, Louisiana—address this problem by requiring that law enforcement agencies provide officers with access to health and wellness programs, physical fitness programs, stress management tools, confidential crisis counseling, or other support services necessary to address the heavy burdens placed on today's police officers. Some of these agreements place limits on agencies' ability to assign back-to-back shifts or excessive overtime, to ensure adequate rest and recovery periods.

Other reform agreements address the possible link between inadequate officer support and police misconduct—including the failure to provide necessary equipment and technology needed to support constitutional policing or the failure to provide basic training to ensure that officers are equipped to handle the demands placed upon them. The Division's reform agreement in **Cleveland**, Ohio, for example, requires the police department to complete a comprehensive equipment and resource study and implement a plan to provide the basic resources—such as computers, patrol cars equipped with linked computers, and first aid equipment—necessary to police safely and effectively.

## Recognizing the Link Between Policing and Other Criminal Justice and Social Systems

Another of the ways the Division's reform agreements have attempted to more effectively and sustainably address police misconduct is by focusing on the links between such misconduct and institutional failures outside of police departments, in areas such as social services, medical and mental health care, jails, and court systems. The Division's reform agreements have begun to tackle this issue in a number of ways. For example:

- In **Ferguson**, Missouri, recognizing the impact of the City's court practices on police misconduct, the Division's reform agreement requires the City to revise its municipal code to ensure that it comports with the U.S. Constitution, and to make changes in its municipal

court to address the discriminatory imposition of court fines and fees and the city's reliance on police officers to generate revenue for the City.

- In **Portland**, Oregon, the Division's reform agreement recognizes that the absence of adequate community mental health services places enormous burdens on law enforcement to respond to people in mental health crisis and contributes to the use of excessive force in police interactions with such individuals. The agreement therefore requires the City of Portland to engage community mental health organizations in designing better systems to improve health services and reduce the burden on law enforcement.

- In **New Orleans**, the Division's reform agreement convenes a regular meeting of law enforcement, public defenders, prosecutors, and judges to identify problems in the criminal justice system and develop solutions that extend beyond reform of the police.  These efforts reflect the reality that policing problems cannot be isolated and cured; they are connected to broader criminal justice and social systems.

# VII. CONCLUDING THE CIVIL RIGHTS DIVISION'S POLICE REFORM AGREEMENTS

A federal police reform agreement will be terminated when the law enforcement agency has fully implemented the terms of the agreement, often including sustained implementation of the agreement for the amount of time agreed upon by the parties (usually two consecutive years).  In the case of court-enforced consent decrees, the federal judge determines when the agreement has been fully implemented and the law enforcement agency has sustained compliance for the agreed-upon time period.

As noted above, the Division's current generation of reform agreements focuses on defined outcome measures to ensure that the court and the independent monitoring team have concrete, objective benchmarks for assessing whether a law enforcement agency has effectively implemented an agreement. Those outcome measures are designed to eliminate guesswork and reduce subjectivity in the determination of whether an agency's reform efforts are resulting in constitutional policing. They are also designed to validate the reforms mandated by an agreement, and ensure that new policies, training, and organizational change accomplish the underlying goals of eliminating patterns of police misconduct.

The Division does not impose a specific term of years on the duration of its reform agreements, because the decision about when a consent decree ends is up to the judge, not the Division or the law enforcement agency, and in agreements not overseen by a court the Division will determine whether to terminate an agreement based on whether the agency has actually implemented the agreement not on whether some particular period of time has passed. However, some agreements describe a goal or expectation among the parties for how long it will take to achieve sustained compliance, usually somewhere between two and four years.

While some of the Division's reform agreements terminate in a short number of years, others have been in place for over a decade. This variation reflects the fact that institutional change presents different challenges to different institutions. Some law enforcement agencies are primed for change and others are face greater challenges grappling with deeply rooted, longstanding issues. Some jurisdictions enjoy strong support from stakeholders and local government leaders and others face significant political or economic challenges. One of the most important factors in determining the length of time a reform agreement lasts appears to be the commitment to and ability of local leadership to make and sustain changes.



No matter what dynamics surround a reform agreement, meaningful and sustainable police reform takes substantial time. For communities and families suffering the effects of police misconduct, the time required to implement the Division's reform agreements can feel like another unreasonable demand, or an empty promise. But when the Division finds a pattern or practice of police misconduct, it usually finds that pattern or practice is the product of many decades of dysfunction that has become engrained in police culture. Reversing that process requires enormous effort and commitment. And, in the Division's experience, reform agreements must contain realistic and fair deadlines for implementation to be effective.

Given the complexity and comprehensiveness of the Division's reform agreements, the Division incorporates several measures designed to increase efficiency and reduce the cost of reform. The Division's current generation of reform agreements generally provide that the independent monitor

should stop reviewing the agency's compliance with certain provisions of the agreement once the agency has fully implemented those provisions, allowing the scope of the agreement to be narrowed over time and for the monitoring team to focus its efforts on areas where the agency is still struggling. In a number of instances where a law enforcement agency has accomplished significant, sustainable reform but discrete issues remain, the Division has terminated a court-supervised consent decree prior to full compliance and entered into a separate transition agreement to address the remaining issues. Such transition agreements reduce the overall burden of compliance and acknowledge the progress the agency has made toward effective, constitutional policing.

Beyond the express terms of reform agreements, the Division's practice is to approach the monitoring and compliance stage of reform with flexibility and an understanding of the need to consider the costs and burdens of reform, while acknowledging that resource constraints cannot excuse unlawful police practices. The Division has a strong interest in ensuring the sustainability of the reforms in its agreements and understands that sustainability often, as a practical matter, requires attention to the financial condition of the local jurisdiction. Financial and staffing challenges often arise in the course of implementation of the Division's reform agreements. Provided those challenges are genuine, approached in good faith, and not pretexts for non-compliance, the Division—and, in the Division's experience, the independent monitor and the court—are committed to working with local jurisdictions to overcome those challenges. The Division has a demonstrated record of working cooperatively with local governments, monitors, and the court to ensure that reforms address systemic police misconduct issues while supporting and enhancing the capacity of police officers to protect public safety.

The Division also works with law enforcement agencies to provide technical assistance and access to opportunities for grants to support reform and advance constitutional policing.

The aim of the Division's reform agreements is to build capacity within the law enforcement agency to sustain the outcomes of the reform agreement after the court, the independent monitor, and the Division have moved on. For example, in March 2016, the federal district court in **Detroit**, Michigan, terminated its oversight of the Detroit Police Department (DPD) pursuant to a reform agreement originally entered in 2003. DPD Assistant Police Chief James White noted that "the reforms that we have engaged in over the course of the past 13 years are . . . embedded in our police."[18]  Likewise, in closing the Division's reform agreement with the **Missoula**, Montana Police Department within two years of its entry, the Department of Justice noted that the agency was "poised to become a model" and "transform the way their city police department responds to reports of sexual assault."[19]

Ultimately, the Division's goal is for its reform agreements to leave a law enforcement agency with an enduring ability to self-correct when misconduct occurs and a culture that strongly supports constitutional and effective policing—and to make these changes as quickly and efficiently as possible.  The Civil Rights Division does not have a magic formula to create a perfect law enforcement agency. But the Division's decades of experience in police reform, and its record of bringing change to law enforcement agencies from California to Connecticut and many places in between, demonstrates the capacity of pattern-or-practice cases to be a critical tool in the nationwide effort to reform police practices.

# VIII. Conclusion: Assessing the Impact of Pattern-or-Practice Enforcement on Police Reform

It has been slightly more than two decades since Congress created the Department of Justice's authority to investigate and remedy systemic police misconduct. In that time, many experts, academics, and stakeholders have weighed in on the question of what impact the Civil Rights Division's pattern-or-practice authority has had on the nationwide movement toward police reform.

In 2010, the Department of Justice convened a roundtable of law enforcement officials, policing experts, and advocates to discuss the Division's pattern-or-practice work. The report from that convening noted that, "[w]ithout exception, everyone providing comments during the roundtable meeting acknowledged the efficacy of pattern-or-practice litigation to reforming policies and practices in local police organizations."[20] Earlier, in 2002, a conference convened to examine the Division's model of independent monitoring reached a consensus that "monitoring, if done correctly, can bring about rapid and responsible police reform without an undue challenge to the authority and autonomy of the police chief."[21] In 2013, the Police Executive Research Forum (PERF) issued a comprehensive review of DOJ's role in monitoring local law enforcement noting some of the challenges of reform and prompting calls for re-examining some aspects of the work. The review also quoted "many police chiefs who have been through the process of a DOJ investigation" as saying "that the end result was a better police department—with improved policies on critical issues such as use of force, better training of officers, and more advanced information systems that help police executives to know what is going on in the department and manage their employees."[22] It further noted that, in many places, the reform agreement provided essential leverage to obtain the funding and political support necessary for reform.

To date, four independent studies have assessed the impact of the Division's reform agreements, focusing in particular on the agreements in **Pittsburgh**, **Los Angeles**, **Cincinnati**, and **Washington, DC**.[23] These studies provide strong evidence that reform under the Division's reform agreements generally succeed in bringing about more effective constitutional policing practices and improved police-community relations.

- The Harvard Kennedy School's study of the **Los Angeles** consent decree found that, following implementation of the decree and other reforms initiated by LAPD leadership in the wake of the decree, "public perceptions of the LAPD are improving, the satisfaction among police officers themselves is growing, management and oversight of the police department is stronger, and the quality as well as the quantity of enforcement activity are rising."[24]

- An academic analysis of the **Pittsburgh**, **Los Angeles** and **Cincinnati** consent decrees concluded that the "best evidence on the DOJ's pattern or practice initiative suggests that after implementing mandated reforms, affected departments will likely possess a stronger, more capable accountability infrastructure, more robust training and a set of policies that reflect best practices."[25]

- The Vera Institute of Justice's study of the **Pittsburgh** consent decree noted that the decree "is a success story for local police management and for federal intervention."[26]

These studies also suggest that some of the common concerns about consent decrees are overstated. Both the Vera Institute study and the Harvard Kennedy School study specifically tested the theory that police enforcement reduces in the wake of consent decrees and found no evidence of such "de-policing"— indeed, the latter study suggested, to the contrary, a positive effect on both the quantity and quality of police activity.[27] Those same studies similarly found no objective evidence that consent decree implementation had a negative effect on officer morale.[28]

Those studies also dispute the notion that implementation of consent decrees risks increasing crime. On the contrary, they suggest the opposite. As the Harvard Kennedy School study of the **Los Angeles** consent decree concluded:

> In the first years, when the Department was led by officials who failed to implement the decree (perhaps because they had resisted and resented it from the start), crime in Los Angeles increased. Then, when new leadership in the Department began to drive implementation of the consent decree, the crime trend turned and fell. The pattern is unmistakable: recorded crime fell after 2002 during the period in which the decree was embraced by the leadership of the LAPD, after rising during the period in which implementation was stalled.[29]

These studies also provide some insight into the durability of the Division's reform agreements. For example:

- In a study conducted 15 years after the initiation of reforms in **Washington, D.C.**, the monitor appointed to oversee that agreement revisited the department and found that "in large measure, the D.C. police department's use of force policies remain consistent with best practices in policing, and the data show that there has been no surge in any type of use of force, including firearms. The number of officer-involved shootings has remained low, and there is no evidence that excessive force has reemerged as a problem within the department."[30]

- The monitor for the **New Jersey State Police**, in his final compliance report concluded that as a result of the consent decree, "[a]mple evidence exists to suggest that the agency has become self-monitoring and self-correcting to a degree not often observed in American law enforcement."[31]

- A recent academic study of reforms in both **Pittsburgh** and **Cincinnati** found that while there was evidence that advances in Pittsburgh had eroded since the implementation of that first police reform agreement, the reforms in Cincinnati accomplished "significant and lasting change within the CPD" and that "[s]ix years removed from DOJ and monitor oversight, [CPD] has experienced little or no backsliding, a finding supported by consistent reductions in undesirable outcomes, including use of force incidence and allegations of abusive or unlawful behavior."[32]

- A different study of the **Pittsburgh** consent decree concluded that years after the termination of that decree, and despite personnel changes and budget pressures, "reforms remain firmly in place today, and both community leaders and citizen surveys reflect significant improvements in service" and "there is no question that the implementation of

the consent decree requirements in Pittsburgh dramatically changed the culture of the Bureau of Police."[33]

Much remains to be studied about the Division's approach to police reform in pattern-or-practice cases. The four existing assessments of the Division's consent decrees in **Pittsburgh**, **Los Angeles**, **Cincinnati**, and **Washington, DC**, examine the first generation model of police reform that prevailed in the first decade following enactment of Section 14141. And these reviews—as well as other commentary from academics and stakeholders—pointed to areas where the Division's reform efforts could improve. As this report makes clear, the Division's model has evolved in response to such feedback, as well as lessons from its past efforts and the incorporation of new thinking from the cutting edge of police reform.  In contrast to the first generation of police reform agreements, the current generation emphasizes:

- Community engagement from the earliest stages of an investigation and throughout the course of a case, including incorporation of community engagement strategies and community-based solutions into reform agreements;

- Incorporating the input of rank-and-file officers at both the investigatory stage and in the development of reform agreements, through engagement with police labor organizations and face-to-face meetings with officers from all ranks, and recognizing the link between officer support and constitutional policing;

- Issuing appropriately detailed findings letters or reports at the conclusion of every investigation, to publicly document the evidence obtained by the Division, explain the Division's conclusions about the existence of a pattern or practice of police misconduct, and set a framework for negotiating a reform agreement;

- Bringing diverse perspectives and real-world policing experience to the independent monitoring teams overseeing court-enforceable consent decrees;

- Defined outcome measures to create objective, evidence-based benchmarks for assessing the value of reforms and the law enforcement agency's compliance with the agreement.

The impact of the Division's work cannot be measured solely by the results in the particular jurisdictions where reform agreements have been implemented, however. The Division's pattern-or-practice cases contribute to nationwide police reform by promoting a model of constitutional policing applicable to any size department, in any part of the country. The Division's findings letters and reform agreements are closely scrutinized by law enforcement agencies that have never been, and likely never will be, the subject of a pattern-or-practice investigation. Pattern-or-practice cases are not a panacea for problems in American policing. But, combined with other federal tools, as well as with state and local reform efforts within both law enforcement agencies and the communities they serve, as well as ongoing efforts by organizations such as the International Association of Chiefs of Police (IACP) and the Police Executive Research Forum (PERF), the Division's work is laying the foundation for more positive and effective policing practices across the country.

# APPENDIX A: SUMMARIES OF THE DIVISION'S PATTERN-OR-PRACTICE CASES

The Division has entered into 40 total reform agreements in pattern-or-practice policing cases. Twenty of those agreements have been court-enforced consent decrees, and 20 have been settlement agreements, typically known as memoranda of agreement, between the United States and the local jurisdiction. Of the eighteen reform agreements resulting from investigations opened since 2008, all have been consent decrees but for those in four jurisdictions (Missoula, Montana; Suffolk County, New York; Miami, Florida; and Alamance, North Carolina). At the time of this publication, the division had 18 open reform agreements, 14 of which are court-enforced consent decrees. Each of the Division's 40 reform agreements is described briefly below.

In addition to these descriptions, as part of this report we have created an interactive Police Reform Finder. This is a guide to the Division's police reform agreements. Using the Police Reform Finder, you can see examples of:
- How the Division's reform agreements have addressed specific kinds of policing issues,
- The Division's police reform by date, and
- The Division's police reform agreements by location.

**Pittsburgh Police Bureau, Pennsylvania (1997-99)**
In April 1996, the Division opened an investigation into the Pittsburgh Police Bureau (PPB). In January 1997, the Division identified a pattern or practice of excessive force; unlawful stops, searches and arrests, linking these findings to insufficient accountability systems and failure to supervise officers. In April 1997, the parties entered into a court-enforced consent decree. The consent decree was terminated in September 2002, with ongoing monitoring of a backlog of investigations of civilian complaints by the city's independent auditor through 2005.

**Steubenville Police Department, Ohio (1997-2005)**
In September 1996, the Division opened an investigation into the Steubenville Police Department (SPD) in Ohio. In June 1997, the Division identified a pattern or practice of excessive force; unlawful stops, searches and arrests; and witness and evidence tampering linked to inadequate policies and training, insufficient supervision, and inadequate systems of accountability. In September 1997, the parties entered into a court-enforced consent decree, which terminated in March 2005.

**New Jersey State Police, New Jersey (1999-2009)**
In April 1996, the Division opened an investigation into the New Jersey State Police (NJPD). In December 1999, the United States filed a complaint alleging a pattern or practice of unlawful traffic stops, searches and arrests, linked to inadequate policies and training, insufficient supervision, and inadequate systems of accountability. Simultaneously, the parties entered into a court-enforced consent decree, which terminated in October 2009.

**Los Angeles Police Department, California (2000-09)**
In July 1996, the Division opened an investigation into the Los Angeles Police Department (LAPD). In May 2000, the Division identified a pattern or practice of excessive force and unlawful stops,

searches and arrests linked to inadequate training, supervision, and accountability systems. In November 2001, the parties entered into a court-enforced consent decree. The consent decree terminated in July 2009, although a transition agreement between the Division and the City of Los Angeles remained in effect until May 2013.

**Highland Park Police Department, Illinois (2000-2004)**
In May 2000, the Division opened an investigation into the Highland Park Police Department in Illinois focusing on discrimination based on race and national origin. In the fall of 2000, the parties entered into a memorandum of agreement (MOA) incorporating the terms of a court-supervised consent decree settling *Ledford, et al. v. City of Highland Park*, No. 00 C 4212 (N.D. Ill), litigation brought by private plaintiffs raising similar issues. The MOA was terminated in December 2004.

**Metropolitan Police Department, Washington, D.C. (2001-2008)**
In February 1999, the Division opened an investigation into the Metropolitan Police Department (MPDC) in Washington, D.C.  In June 2001, the Division identified a pattern or practice of excessive force linked to inadequate use of force policies and training; deficient supervision of officers; and inadequate systems of accountability. The parties entered into a memorandum of agreement (MOA), including the appointment of an independent monitor. The independent monitorship terminated in April 2008, although under a transition agreement MPDC provided on-going reporting on certain provisions of the MOA until February 2012.

**Buffalo Police Department, New York (2002-2008)**
In December 1997, the Division opened an investigation into the Buffalo Police Department in New York, focused on the use of "chemical agent propellant" sprays, such as pepper spray or tear gas. The Division and the City of Buffalo entered into a memorandum of agreement in 2002, which was modified in June 2007 and terminated in July 2008.

**Columbus Police Department, Ohio (2002-2004)**
In March 1998, the Division opened an investigation into the Columbus Police Department in Ohio. In October 1999, the Division filed suit against the City of Columbus, alleging a pattern or practice of excessive force; and unlawful stops, searches and arrests linked to inadequate policies and training; inadequate supervision of officers; and failures to investigate misconduct and hold officers accountable. The Division and the City of Columbus resolved the litigation by agreement in 2002, which terminated in May 2004.

**Cincinnati Police Department, Ohio (2002-2008)**
In May 2001, the Division opened an investigation into the Cincinnati Police Department (CPD) in Ohio. In October 2001, the Division identified the need for improvements in use of force policies, reporting and review; accountability systems, officer discipline, data collection, and transparency; and training.  Negotiations were integrated with ongoing negotiations regarding a lawsuit brought by private plaintiffs. In April 2002, the Division entered into a memorandum of agreement (MOA) with the City of Cincinnati. The Division's MOA was incorporated into a consent decree settling the private lawsuit, which together became known as the "Collaborative Agreement."  The Collaborative Agreement provided for a single monitoring team to oversee implementation of the reforms in both the Department's MOA and the broader Collaborative Agreement. The Division's MOA was terminated in April 2007 and the broader Collaborative Agreement was terminated in August 2008.

**Mt. Prospect Police Department, Illinois (2003-2006)**

In April 2000, the Division opened an investigation into the Mt. Prospect Police Department in Illinois, focusing on discrimination based on race and national origin in traffic stops. In 2003, the parties entered into a memorandum of agreement, which terminated in December 2006.

**Montgomery County Police Department, Maryland (2003-05)**

In June 1996, the Division opened an investigation into the Montgomery County Police Department (MCPD) in Montgomery County, Maryland, focused on racially discriminatory traffic stops, searches and arrests. The Division and Montgomery County entered into a memorandum of agreement (MOA) in 2002, which was terminated in February 2005.

**Villa Rica Police Department, Georgia (2003-2006)**

In January 2003, the Division opened an investigation into the Villa Rica Police Department (VRPD) in Villa Rica, Georgia focusing on discriminatory policing and unlawful traffic stops and searches. On December 23, 2003, the parties entered into a memorandum of agreement (MOA) including appointment of an independent monitor.  The MOA was terminated in December 2006.

**Detroit Police Department, Michigan (2003-2014)**

In May 2001, the Division opened an investigation into the Detroit Police Department (DPD). In March, April, and June 2002, the Division sent letters to DPD identifying areas in need of reform, including reporting and investigating uses of force; officer supervision and discipline; and arrest and detention policies. In July 2003, the court approved a consent decree between the Division and the City of Detroit. (On the same day the Division and the City entered into a separate consent decree addressing a related investigation into the conditions of police lock-ups and holding cells).  In August 2014, the court terminated the consent decree and the Division and the City of Detroit entered into a separate transition agreement under which the Division would continue to monitor DPD's efforts to comply with certain provisions of the prior consent decree that had not yet been fully implemented. In March 2016, the Division found DPD in full compliance with the terms of the transition agreement and closed the case.

**Prince George's County Police Department, Maryland (2004-2007; 2004-2009)**

In July 1999, the Division opened an investigation into the Prince George's County Police Department (PGPD) in Maryland, focusing on its canine unit. In October 2000, the Division opened a second investigation into broader issues of use of force by PGPD.  In January 2004, the parties entered into a memorandum of agreement (MOA) addressing the broader use of force issues and a consent decree addressing the use of canines, which was approved by the court in March 2004. The consent decree was terminated in March 2007 and the MOA was terminated in January 2009.

**Orange County Sheriff's Department, Florida (2008-2013)**

In January 2007, the Division opened an investigation into the Orange County Sheriff's Department (OCSD) in Florida. In August 2008, the Division identified concerns regarding the excessive use of conducted energy devices (also known by the brand name Tasers). In September 2010, the Division and OCSD entered into a memorandum of agreement, which terminated in April 2013.

**Virgin Islands Police Department, U.S. Virgin Islands (2009-OPEN)**

In March 2004, the Division opened an investigation into the Virgin Islands Police Department (VIPD). In October 2005, the Division issued a letter identifying needed reforms to VIPD's general policies and training; use of force policies, including those governing specific types of force; use of force reporting systems; use of force investigation and review; conditions in police lock-ups and holding cells; internal complaint systems; officer disciplinary systems; and internal supervisions systems, including the creation of an early intervention system. In March 2009, the parties entered into a court-enforced consent decree, which remains in effect.

### Easton Police Department, Pennsylvania (2010-2015)
In October 2005, the Division opened an investigation into the Easton Police Department in Pennsylvania, focusing on use of force, including less-lethal weapons, vehicle pursuits, and canines. August 2010, the Division and EPD entered into a memorandum of agreement, which terminated in July 2015.

### Beacon Police Department, New York (2010-2016)
In June 2005, the Division opened an investigation into the Beacon Police Department (BPD) in New York, focusing on use of force. In December 2010, the Division and the BPD entered into a memorandum of agreement, which terminated in August 2016.

### Seattle Police Department, Washington (2012-OPEN)
In March 2011, the Division opened an investigation into the Seattle Police Department (SPD) in Washington. In December 2011, the Division identified a pattern or practice of excessive force and raised concerns about racially discriminatory policing. In September 2012, the parties entered into a court-enforced consent decree, which remains in effect.

### East Haven Police Department, Connecticut (2012-OPEN)
In September 2009, the Division opened an investigation into the East Haven Police Department (EHPD) in East Haven, Connecticut. In December 2011, the Division identified a pattern or practice of discriminatory policing against Latinos, particularly in traffic enforcement. In December 2012, the parties entered into a court-enforced consent decree, which remains in effect.

### Warren Police Department, Ohio (2012-OPEN)
In December 2004, the Division opened an investigation into the Warren Police Department (WPD) in Ohio focusing on use of force and strip-search practices. In January 2012, the parties entered into a court-enforced consent decree which remains in effect.

### Portland Police Bureau, Oregon (2012-OPEN)
In June 2011, the Division opened an investigation into the Portland Police Bureau (PPB) in Oregon. In September 2012, the Division identified a pattern or practice of excessive force against persons with mental illness. In 2012, the parties entered into a court-enforced consent decree, which remains in effect.

### Missoula Police Department, Missoula County Attorney's Office, and University of Montana Office of Public Safety, Montana (2013-2015)
In May 2012, the Division opened an investigation into the Missoula County Attorney's Office (MCAO), Missoula Police Department (MPD), and University of Montana Office of Public Safety (UM-OPS) in Missoula, Montana, focused on gender bias in the handling of sexual assault complaints. In May 2013, the Division issued findings letters to the MPD and UM-OPS identifying a

pattern or practice of failing adequately respond to and investigate allegations of sexual assault against women. In February 2014, the Division issued a separate findings letter to the Missoula County Attorney's Office, identifying a pattern or practice of failing to ensure unbiased and effective investigation and prosecution of reports of sexual assault by women. In May 2013, the Division entered into a memorandum of agreement (MOA) with the MPD and UM-OPS, including appointment of an independent monitor.  In June 2014, the Division entered into a separate "memorandum of understanding" (MOU) with MCAO. In May 2015, the Division terminated the MOA with the MPD and in July 2015 the Division terminated the MOA with UM-OPS.

**New Orleans Police Department, Louisiana (2013-OPEN)**
In May 2010, the Division opened an investigation of the New Orleans Police Department (NOPD). The Division had previously opened an investigation into NOPD in June 1995, which closed in March 2004. In March 2011, the Division identified a pattern or practice of excessive force; unlawful stops, searches and arrests; discrimination on the basis of race, national origin, and LGBT status; and gender discrimination in the failure to adequately respond to and investigate violence against women. In January 2013, the parties entered into a court-enforced consent decree, which remains in effect.

**Puerto Rico Police Department (2013-OPEN)**
In July 2008, the Division opened an investigation into the Puerto Rico Police Department (PRPD). In September 2011, the Division identified a pattern or practice of excessive force, violations of the First Amendment right to observe and record police activity and unlawful searches and seizures resulting from inadequate policies, supervision, training, accountability, and community engagement. The findings letter also raised concerns about patterns of discriminatory policing. In July 2013, the parties entered into a court-enforced consent decree, which remains in effect.

**Albuquerque Police Department, New Mexico (2014-OPEN)**
In November 2012, the Division opened an investigation into the Albuquerque Police Department (APD) in New Mexico. In April 2014, the Division issued a findings letter identifying a pattern or practice of excessive force, including deadly force. In late 2014, the parties entered into a court-enforced consent decree, which remains in effect.

**Suffolk County Police Department, New York (2014-OPEN)**
In September 2009, the Division opened an investigation into the Suffolk County Police Department (SCPD) in New York, focused on patterns of biased-based policing against Latinos and person with limited or no English proficiency. In January 2014, the parties entered into a memorandum of agreement, which remains in effect.

**Cleveland Division of Police, Ohio (1999-2005) (2015-OPEN)**
In August 2000, the Division opened an investigation into the Cleveland Division of Police (CDP) in Cleveland, Ohio. The Division and the City of Cleveland entered into a memorandum of agreement in 2004, which was terminated in March 2005. In March 2013, the Division opened a new investigation into CDP. In December 2014, the Division identified a pattern or practice of excessive force, and raised concerns about search and seizure practices, resulting from insufficient accountability, inadequate training and equipment, flawed policies, and inadequate community engagement.  In June 2015, the parties entered into a court-enforced consent decree, which remains in effect.

45

**Los Angeles County Sheriff's Department, California (2015-OPEN)**
In August 2011, the Division opened an investigation into the Los Angeles County Sheriff's Department (LASD) in California.  In June 2013, the Division identified a pattern or practice of harassment and profiling of black and Latino residents of Palmdale and Lancaster, California.  In May 2015, the parties entered into a court-enforced consent decree, which remains in effect.

**Meridian Police Department, Mississippi (2015-OPEN)**
In December 2011, the Division opened an investigation into the Meridian Police Department as part of a broader investigation into the administration of juvenile justice in Meridian, Mississippi. In August 2012, the Division identified a pattern or practice of arresting children in schools without probable cause. In September 2015, the parties entered into a court-enforced consent decree, which remains in effect.

**Maricopa County Sheriff's Department, Arizona (2015-OPEN)**
In March 2009, the Division opened an investigation into the Maricopa County Sheriff's Office (MCSO) in Phoenix, Arizona.  In September 2010 the Division filed suit seeking to compel MCSO to provide information relevant to the Division's investigation.  In June 2011, MCSO settled that litigation by agreeing to cooperate in the Division's investigation.  In December 2011, the Division identified a pattern or practice of discriminatory policing against Latinos; unlawful stops and arrests; and unlawful retaliation against people who make complaints or criticize MCSO. (The Division also made findings with regard to MCSO's operation of jails.) In May 2012, after attempts to reach agreement on a consent decree were unsuccessful, the Division filed litigation under Section 14141. In June 2015, the court granted summary judgment in the Division's favor on the discriminatory policing claim.  In July 2015, the parties entered into a consent decree addressing issues concerning worksite raids, retaliation, and language access requirements. That consent decree remains in effect. Separately, the parties entered into a memorandum of agreement regarding MCSO's operation of local jails, which also remains in effect. In August 2015, the Division intervened in parallel private litigation, *Melendres v. Arpaio*, in which MCSO is under an injunction to reform discriminatory law enforcement practices. Litigation in that matter is ongoing.

**City of Miami Police Department, Florida (2016-OPEN)**
In November 2011, the Division opened an investigation into the Miami Police Department (MPD) in Florida. (The Division had previously opened an investigation into MPD in May 2002 but closed it without findings in May 2006.) In July 2013, the Division identified a pattern or practice of excessive deadly use of force in discharging firearms. In February 2016, the Division and the City of Miami entered into a memorandum of agreement (MOA) resolving the Division's claims, including appointment of an independent monitor. That MOA remains in effect.

**Ferguson Police Department, Missouri (2016-OPEN)**
In September 2014, the Division opened an investigation into the Ferguson Police Department (FPD) and the municipal court in Ferguson, Missouri.  In March 2015, the Division identified a pattern or practice of unlawful stops and arrests, including violations of the First Amendment right to observe and record police activity; excessive force; and discriminatory policing.  The Division further determined that FPD and the municipal court focused on revenue generation at the expense of public safety and constitutional law enforcement. In March 2016, the parties entered into a court-enforced consent decree, which remains in effect.

**Newark Police Department, New Jersey (2016-OPEN)**

In May 2011, the Division opened an investigation into the Newark Police Department in Newark, New Jersey. In July 2014, the Division identified a pattern or practice of unlawful stops, searches and arrests; discriminatory policing; excessive force; and theft by officers.  The Division further identified concerns about gender bias in policing, discriminatory policing against members of the LGBTQ community, and failure to protect from harm in police lock-ups.  In April 2016, the parties entered into a court-enforced consent decree, which remains in effect.

**Alamance County Sheriff's Office, North Carolina (2016-OPEN)**
In June 2010, the Division opened an investigation into the Alamance County Sheriff's Office in North Carolina. In September 2012, the Division identified a pattern or practice of unlawful discrimination against Latinos and unlawful stops and arrests in violation of the Fourth Amendment. In December 2012, the Division determined that it was unable to resolve its claims cooperatively and filed a complaint under Section 14141. In August 2015, a federal district court dismissed the United States' claims after trial. The United States appealed this judgment, and in August 2016, while the appeal was pending, the United States and Alamance County entered into a memorandum of agreement, which remains in effect.

**Yonkers Police Department, New York (2016-OPEN)**
In August 2007, the Division opened an investigation into the Yonkers Police Department (YPD) in New York. In June 2009, the Division addressed the need for reform of YPD's use of force policies, reporting uses of force, investigations of uses of force, handling of civilian complaints, officer supervision and discipline, creation of an early warning system, improved training, and expanded community engagement. In November 2016, the United States and the City of Yonkers entered into a memorandum of agreement, which remains in effect.

## Other Open Pattern-or-Practice Cases

In addition to the 40 cases leading to reform agreements described above, the Division has five open investigations and one case that remains in active litigation. Those cases are described below.

**Colorado City, Arizona and Hildale, Utah**
In April 2011, the Division opened an investigation into law enforcement agencies in the neighboring cities of Colorado City, Arizona and Hildale, Utah. In June 2012, the Division filed a complaint alleging that the cities and other entities under their control were engaged in a pattern or practice of discrimination against people who are not members of the Fundamentalist Church of Jesus Christ of Latter-day Saints. In March 2016, the Division prevailed at trial. Litigation on the issue of remedying violations of law found by the court and jury is ongoing.

**Ville Platte Police Department and Evangeline Parish Sheriff's Office, Louisiana**
In April 2015, the Division opened investigations into the Ville Platte Police Department and the Evangeline Parish Sheriff's Office, both of which operate in Ville Platte, Louisiana. In December 2016, the Division identified a pattern or practice in both departments of so-called "investigative holds"—illegally jailing people who police think may be witnesses to or otherwise associated with a crime, but who police do not have any probable cause to arrest, often for the purpose of coercing the person into confessing or providing information about the crime.

**Baltimore Police Department, Maryland**

In May 2015, the Division opened an investigation into the Baltimore Police Department (BPD) in Baltimore, Maryland. In August 2016, the Division identified a pattern or practice of unlawful stops, searches and arrests; discriminatory policing; excessive force, including use of force against people with disabilities in violation of the Americans with Disabilities Act; and violations of the First Amendment right to observe and record police activity. The Division also identified concerns with BPD's handling of sexual assault investigations and transport practices.  The Division and the City of Baltimore are engaged in ongoing discussions to resolve these issues.

**Chicago Police Department, Illinois**
In December 2015, the Division opened an investigation into the Chicago Police Department in Chicago, Illinois. The Division's investigation is ongoing.

**Orange County Sheriff's Department and Office of the District Attorney, California**
In December 2016, the Division opened an investigation into the Orange County Sheriff's Department and Office of the District Attorney. The Division's investigation is ongoing.

48

# APPENDIX B: OTHER DEPARTMENT OF JUSTICE POLICE REFORM TOOLS

## Criminal Civil Rights Prosecutions

The Civil Rights Division and the United States Attorney's Offices have authority to criminally prosecute any law enforcement officer who willfully deprives a person of a Constitutional or federal right or engages in a conspiracy to deprive a person of a Constitutional or federal right.[34]

Criminal civil rights prosecutions differ significantly from civil pattern-or-practice cases in both purpose and result. Whereas pattern-or-practice cases focus on a law enforcement agency's responsibility to cure systemic or institutional failures that lead to widespread police misconduct, criminal civil rights prosecutions focus on an individual officer's culpability for a particular instance of misconduct. And whereas pattern-or-practice cases seek a court order compelling state or local governments to institute a wide range of reforms over time under the supervision of the court and an independent monitor in order to promote constitutional policing practices, criminal civil rights prosecutions seek to convict and sentence an officer in order to punish and deter individual wrongdoing.

Despite these differences, calls to open civil and criminal civil rights investigations can arise from the same instances of police misconduct, particularly when a troubling individual incident galvanizes public attention to or sheds light on systemic problems in a law enforcement agency. Even when the relevant facts overlap, however, the decision to open a civil pattern-or-practice investigation and the decision to open a criminal civil rights investigation are made independently, based on the different legal standards applicable to each type of case. Civil pattern-or-practice cases are handled by the Special Litigation Section of the Civil Rights Division, whereas criminal civil rights prosecutions are handled by the Criminal Section of the Civil Rights Division and/or a local United States Attorney's Office. Both the Special Litigation and Criminal Sections report to the Assistant Attorney General for Civil Rights, and the United States Attorney's Manual requires the United States Attorneys to consult with the Civil Rights Division on all criminal civil rights matters.

In many cases, however—even in cases where police shootings or other uses of force informed the Division's decision to find a pattern or practice of police misconduct in a law enforcement agency—the Division cannot bring criminal charges against individual officers. To prosecute an officer under the criminal law for violating someone's rights, the government must prove beyond a reasonable doubt that the officer's actions, such as shooting a person or otherwise using force, was objectively unreasonable based on all of the surrounding circumstances. Additionally, and unlike in the civil context, the government must prove beyond a reasonable doubt that the officer acted willfully. This high legal standard – one of the highest standards of intent imposed by law – requires proof that the officer acted with the specific intent to do something the law forbids. It is not enough to show that the officer made a mistake, acted negligently, acted by accident or mistake or even exercised bad judgment. For this reason, even where the evidence is sufficient to find a pattern or practice of police misconduct and hold a law enforcement agency civilly responsible for its failure to provide the support or accountability mechanisms needed to avoid violations of civil rights, the evidence may not be sufficient to support holding individual officers criminally responsible under existing federal law for specific instances of such violations.

## Office of Community Oriented Policing Services (COPS Office) Collaborative Reform Initiative for Technical Assistance

The COPS Office—a separate component of the U.S. Department of Justice from the Civil Rights Division—is responsible for advancing the practice of community policing by the nation's state, local, territorial, and tribal law enforcement agencies through information and grant resources. COPS's Collaborative Reform Initiative advances police reform by undertaking assessments of a law enforcement agency's operations, providing recommendations for reform, and assisting the agency in implementing those reforms. The COPS Office has undertaken Collaborative Reform Initiatives in several cities, including Las Vegas, Philadelphia, Fayetteville, Milwaukee, and San Francisco.

Although the aims of COPS's Collaborative Reform Initiative and the Civil Rights Division's pattern-or-practice cases are similar, their means are significantly different. Whereas pattern-or-practice cases are initiated by the Assistant Attorney General upon a finding of cause, Collaborative Reform must first be requested by the subject law enforcement agency. Both approaches require the careful review and vetting across the U.S. Department of Justice. Pattern-or-practice investigations and the resulting remedies are compelled by threat of litigation and court order, whereas agencies participating in Collaborative Reform agree to implement reforms voluntarily at the outset. In any given jurisdiction, these differences could be strengths or weaknesses. For that reason, the Department of Justice considers COPS Collaborative Reform and the Civil Rights Division's pattern-or-practice cases to be complementary strategies to achieve police reform.

In addition to Collaborative Reform, since 1994, the COPS Office has invested more than $14 billion to advance community policing nationwide. Working in partnership with major law enforcement organizations, COPS has conducted research and development, including executive sessions on topics such as use of force, constitutional policing, and officer safety. These efforts provide assistance and perspectives on substantive policing issues affecting law enforcement professionals and communities across the country.

## OJP Bureau of Justice Assistance and Diagnostic Center

The Department's Office of Justice Programs (OJP) provides resources and technical assistance to support policing through a variety of programs, particularly through the work of the Bureau of Justice Assistance (BJA) and the Diagnostic Center. BJA programs have trained thousands of law enforcement officials and provided equipment, technology and other resources for effective policing through millions of dollars in grants to local and tribal agencies across the country. Furthermore, BJA supports 45 sites through its Smart Policing Initiative, a program that brings together law enforcement leaders and researchers to employ evidence-based practices that target local crime challenges.

OJP's Diagnostic Center tackles discrete policing and other criminal justice challenges identified by a local law enforcement agency that requests help from the Center. The Center provides hands-on technical assistance with a focus on data analysis and evidence-based solutions for specific, known problems. The Center has helped law enforcement agencies across the country with a variety of objectives, such as improving homicide clearance rates and assessing and identifying weaknesses in officer supervision and discipline processes.

The Office for Civil Rights (OCR) at OJP ensures that recipients of financial assistance from OJP, COPS, and the Office on Violence Against Women (OVW) comply with federal laws that prohibit discrimination in both employment and the delivery of services or benefits based on race, color, national origin, sex, religion, disability and age.

---

[1] Report of the Independent Commission on the Los Angeles Police Department (Christopher Commission Report) (July 9, 1991).

[2] Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141(a).

[3] 42 U.S.C. §14141(b).

[4] U.S. Const. Am. I; U.S. Const. Am. IV; U.S. Const. Am. XIV; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. §3789(c); the Americans with Disabilities Act, 42 U.S.C. § 12131**;** and Section 504 of the Rehabilitation Act of 1973,  29 U.S.C. § 794.

[5] Robert C. Davis, et al., *Can Federal Intervention Bring Lasting Improvement in Local Policing? The Pittsburgh Consent Decree*, Vera Institute of Justice (April 2005) at i.

[6] The 18 open reform agreements are in: the U.S. Virgin Islands; Seattle, Washington; East Haven, Connecticut; Warren, Ohio; Portland, Oregon; New Orleans, Louisiana; Puerto Rico; Albuquerque, New Mexico; Suffolk County, New York; Cleveland, Ohio; Los Angeles County, California; Meridian, Mississippi; Maricopa County, Arizona; Miami, Florida; Ferguson, Missouri, Newark, New Jersey; Alamance County, North Carolina; and Yonkers, New York. The five open investigations are in: Ville Platte, Louisiana; Evangeline Parish, Louisiana; Baltimore, Maryland; Chicago, Illinois; and Orange County, California. The case in active litigation involves the cities of Colorado City, Arizona and Hildale, Utah. A complete list of the Division's 14141 cases is appended to this report.

[7] The scope of any investigation and the manner in which it is conducted is inherently dependent on the facts and circumstances of a given situation.  Thus, the Division may not necessarily take a particular investigatory step described below in every instance.  Nor are the description of possible investigatory steps meant to be exhaustive.

[8] Samuel J. Walker and Morgan Macdonald, *An Alternative Remedy for Police Misconduct*, 19 Civ. Rights L.J. 479, 480 (2009) ("[I]n terms of the long-term process of police reform, the various outcomes under Section 14141 embody a set of 'best practices' that serves as a model for other police reform efforts."). *See also* Debra Livingston, Police Reform and the Department of Justice: An Essay on Accountability, 2 Buff. Crim. L. Rev. 815, 845 (1999) ("[E]nforcement of Section 14141 may have the beneficial effect of further stimulating the articulation and dissemination of national standards governing core police managerial responsibilities."); Myriam E. Gilles*, Reinventing Structural Reform Litigation*, 100 Colum. L. Rev. 1384, 1407 (2000); Richard Jerome, *Police Reform: A Job Half Done*, ACS Issue Brief (2004) at 5 (noting that "the Justice Department's potential 'hammer' prompted many police departments to review their policies and procedures and implement additional systems for accountability, in order to avoid a Justice Department investigation. Agencies have also looked to the measures that were incorporated into the Justice Department agreements as progressive and necessary accountability practices.").

[9] U.S. Department of Justice, *Taking Stock: Report from the 2010 Roundtable on the State and Local Law Enforcement Police Pattern or Practice Program*, NCJ 234458 (Sept. 2011).

[10] The Vera Institute's assessment of the Pittsburgh consent decree identified the Division's efforts to allow the city to "play the primary role in making the selection" of the monitor as an important factor in the success of that decree, as it "likely increased the confidence of city officials in the monitor and facilitated his work." Robert C. Davis, et al., *Turning Necessity Into Virtue: Pittsburgh's Experience With a Federal Consent Decree*, Vera Institute of Justice (September 2002) at 11.

[11] U.S. Department of Justice, Community Oriented Policing Services, *Community Policing Defined* (2014), available at www.cops.usdoj.gov/pdf/vets-to-cops/e030917193-cp-defined.pdf.

[12] Police Executive Research Forum (PERF), *Guiding Principles on Use of Force*, Critical Issues in Policing Series (March 2016).

[13] https://www.washingtonpost.com/graphics/national/police-shootings/

[14] U.S. Department of Justice, *Taking Stock: Report from the 2010 Roundtable on the State and Local Law Enforcement Police Pattern or Practice Program*, NCJ 234458 (Sept. 2011) at 4.

[15] Samuel J. Walker and Morgan Macdonald, *An Alternative Remedy for Police Misconduct*, 19 Civ. Rights L.J. 479, 508 (2009).

[16] International Association of Police Chiefs and the U.S. Dep't of Justice Office of Community Oriented Policing Services, *The Impact of Video Evidence on Modern Policing: A National Study on the Use and Impact of In-Car Cameras* (2005), available at https://www.bja.gov/bwc/pdfs/IACPIn-CarCameraReport.pdf.

[17] Up to date studies on the implications of body-worn cameras are available through the United States Bureau of Justice Assistance Body-Worn Camera Toolkit, available at https://www.bja.gov/bwc/topics-research.html. Studies supporting the conclusion that body-worn cameras improve outcomes include William Farrar, *Operation Candid Camera: Rialto Police Department's Body-Worn Camera Experiment*, The Police Chief 81 (2014); Harold Rankin, *End of Program Evaluation and Recommendations: On-Officer Body Camera System*, Mesa, AZ Police Department (2013); Katz, et al., *Evaluating the Impact of Officer Worn Body Cameras in the Phoenix Police Department*, ASU Center for Violence Prevention and Community Safety (December 2014); Michael D. White, et al., *Police Officer Body-Worn Cameras: Assessing the Evidence*, OJP Diagnostic Center (2014).

[18] Tresa Baldas, *Detroit Police Finally Rid of Federal Oversight*, Detroit Free Press (Mar. 31, 2016).

[19] Department of Justice, Office of Public Affairs, *Justice Department Announces Missoula Police Department Has Fully Implemented Agreement to Improve Response to Reports of Sexual Assault*, (May 11, 2015) (available at https://www.justice.gov/opa/pr/justice-department-announces-missoula-police-department-has-fully-implemented-agreement).

[20] U.S. Department of Justice, *Taking Stock: Report from the 2010 Roundtable on the State and Local Law Enforcement Police Pattern or Practice Program*, NCJ 234458 (Sept. 2011) at 2.

[21] Police Assessment Resource Center, *The Monitors and the Monitored Conference Summary* (October 11, 2002) at 1.

[22] Police Executive Research Forum (PERF*), Civil Rights Investigations of Local Police: Lessons Learned*, Critical Issues in Policing Series (July 2013).

[23] Michael R. Bromwich, et al., *The Durability of Police Reform: The Metropolitan Police Department and Use of Force: 2008-2015*, Office of the District of Columbia Auditor (Jan. 28, 2016); Joshua M. Chanin, *Examining the Sustainability of Pattern or Practice Police Misconduct Reform*, 18 Police Quarterly 163 (2015); Christopher Stone, et al., *Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD*, Program in Criminal Justice Policy and Management, Harvard Kennedy School (May 2009); Robert C. Davis, et al., *Can Federal Intervention Bring Lasting Improvement in Local Policing? The Pittsburgh Consent Decree*, Vera Institute of Justice (April 2005). *See also* Robert C. Davis, et al., *Turning Necessity Into Virtue: Pittsburgh's Experience With a Federal Consent Decree*, Vera Institute of Justice (September 2002).

[24] Christopher Stone, et al., *Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD*, Program in Criminal Justice Policy and Management, Harvard Kennedy School (May 2009) at 2.

[25] Joshua M. Chanin, *Examining the Sustainability of Pattern or Practice Police Misconduct Reform*, 18 Police Quarterly 163, 185 (2015).

[26] Robert C. Davis, et al., *Can Federal Intervention Bring Lasting Improvement in Local Policing? The Pittsburgh Consent Decree*, Vera Institute of Justice (April 2005) at i.

[27] Christopher Stone, et al., *Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD*, Program in Criminal Justice Policy and Management, Harvard Kennedy School (May 2009) at i, 22, 31-32 (finding "no objective sign of so-called 'de-policing' since" implementation of the LAPD consent decree and that "[a]t the end of our analysis of de-policing claims, the meaning of the data seems clear, especially from 2002 onwards: both the quantity and quality of enforcement activity have increased."); Robert C. Davis, et al., *Can Federal Intervention Bring Lasting Improvement in Local Policing? The Pittsburgh Consent Decree*, Vera Institute of Justice (April 2005) at i (noting that "performance data provided by the Bureau and our citizen survey do not support" the belied that reforms made police "less active and aggressive in fighting crime").

[28] Christopher Stone, et al., *Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD*, Program in Criminal Justice Policy and Management, Harvard Kennedy School (May 2009); Robert C. Davis, et al., *Turning Necessity Into Virtue: Pittsburgh's Experience With a Federal Consent Decree*, Vera Institute of Justice

(September 2002) (finding that "indicators of officer morale . . . did not show negative trends following the decree.").

[29] Christopher Stone, et al., *Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD*, Program in Criminal Justice Policy and Management, Harvard Kennedy School (May 2009) at 6.

[30] Michael R. Bromwich, *DC is Proof that Police Reforms Can Work*, Washington Post (Jan. 29, 2016); Michael R. Bromwich, et al., *The Durability of Police Reform: The Metropolitan Police Department and Use of Force: 2008-2015*, Office of the District of Columbia Auditor (Jan. 28, 2016) at 114.

[31] Public Management Resources, Monitors' Sixteenth Report (2007) at iv (available at http://www.state.nj.us./lps/monitors-report-16.pdf).

[32] Joshua M. Chanin, *Examining the Sustainability of Pattern or Practice Police Misconduct Reform*, 18 Police Quarterly 163, 170, 179-80 (2015).

[33] Robert C. Davis, et al., *Can Federal Intervention Bring Lasting Improvement in Local Policing? The Pittsburgh Consent Decree*, Vera Institute of Justice (April 2005) at I, 40-41.

[34] 18 U.S.C. §§ 241, 242.